OPINION OF THE COURT
Charles J. Siragusa, J.
This matter comes before the court on a motion for partial summary judgment brought by the plaintiffs and on a cross motion for summary judgment brought by the defendants. The plaintiffs commenced this action with a complaint dated August 24, 1993, requesting that ordinance No. 93-62 be declared "invalid and illegal”, and further, that the defendants be permanently enjoined from enforcing the law. Ordinance No. 93-62 concerns the possession and sale of semiautomatic rifles and shotguns, as well as the possession and use of air guns and imitation weapons.
It is the determination of the court that ordinance No. 93-62’s regulation of semiautomatic rifles and shotguns, when possessed with ammunition feeding devices permitting them to be loaded with a combination of more than six rounds in the feeding device and chamber, is a lawful exercise of police power on the part of the City of Rochester. However, the court finds that the ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, insofar as it attempts to make criminal the sale or the possession of certain guns of some manufacturers while allowing the possession of essentially identical guns made by others. Also, the court finds that the definition of air guns, as contained in the ordinance, is vague and overbroad, and that the regulation of both air guns and imitation weapons is preempted by State and Federal law. The remainder of the ordinance is, in the court’s judgment, lawful.
The plaintiffs have alleged 17 separate causes of action. However, many of these overlap, and are more efficiently analyzed in the categories enumerated below.
THE SECOND AMENDMENT
Central to the plaintiffs’ contention that a municipality may not limit the rights of individuals to possess such guns as *827 they choose is the reliance on the words of the Second Amendment of the United States Constitution: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” Plaintiffs’ reliance on this language to support their position is at odds with the weight of current legal authority. In United States v Warin (530 F2d 103, 106 [6th Cir 1976], cert denied 426 US 948 [1976]), the Sixth Circuit United States Court of Appeals stated "the [Supreme] Court did not hold * * * that the Second Amendment is an absolute prohibition against all regulation of the manufacture, transfer and possession of any instrument capable of being used in military action.” This language is perhaps most significant because it has been universally held that the Second Amendment guarantees no right to keep and bear a firearm if it does not have some reasonable relationship to the preservation or efficiency of a well-regulated militia (see, e.g., Lewis v United States, 445 US 55, 65, n 8 [1980]). Moreover, as noted in the well-reasoned decision of the Ohio Supreme Court in Arnold v City of Cleveland (67 Ohio St 3d 35, 39, 616 NE2d 163, 166 [1993]), "[t]he question of whether individuals have a fundamental right to bear arms has, seemingly, been decided in the negative under the Second Amendment to the United States Constitution [citations omitted]” (see also, Justice v Elrod, 832 F2d 1048 [7th Cir 1987]).
The Second Circuit Court of Appeals has found "the right to possess a gun is clearly not a fundamental right” (United States v Toner, 728 F2d 115, 128 [2d Cir 1984]).
The Second Amendment limits only the power of Congress to infringe upon the right to keep and bear arms necessary for the militia. It creates no bar to State or local action. "We note that the Second Amendment has not yet been held applicable to the states. The amendment has not been absorbed either directly or through selective incorporation in the Fourteenth Amendment.” (Arnold v City of Cleveland, supra, 67 Ohio St 3d, at 41, 616 NE2d, at 168, citing Malloy v Hogan, 378 US 1 [1964]; see also, Fresno Rifle & Pistol Club v Van De Kamp, 965 F2d 723 [9th Cir 1992]; Sklar v Byrne, 727 F2d 633, 639 [7th Cir 1984]; Cases v United States, 131 F2d 916 [1st Cir 1942], cert denied 319 US 770 [1943]; United States v Kozerski, 518 F Supp 1082, 1090 [D NH 1981], affd 740 F2d 952 [1st Cir 1984], cert denied 469 US 842 [1985]; United States v Hale, 978 F2d 1016 [8th Cir 1992], cert denied — US —, 113 S Ct *828 1614; People v Morrill, 101 AD2d 927 [3d Dept 1984]; Matter of Moore v Gallup, 267 App Div 64 [3d Dept 1943].)
The Second Amendment does, of course, limit the power of Congress to enact legislation effecting the possession of certain types of weapons. The holding in United States v Miller (307 US 174, 178 [1939]) found that Congress was prevented from banning guns which have "some reasonable relationship to the * * * well regulated militia”. As recently as Lewis v United States (supra), the United States Supreme Court has recognized a need for this relationship between the actual weapon sought to be possessed and the militia service.
Congress is not limited, however, from regulating weapons merely because they may have some theoretical or hypothetical military use or merely because of some technical definition of the term "militia”, which includes all or substantially all the people in the country: "Since the Miller decision, no federal court has found any individual’s possession of a military weapon to be 'reasonably related to a well regulated militia’. 'Technical’ membership in a. state militia [e.g., membership in a 'unorganized’ state militia] or membership in a non-governmental military organization is not sufficient to satisfy the 'reasonable relationship’ test.” (United States v Hale, 978 F2d, supra, at 1020, citing United States v Oakes, 564 F2d 384, 387 [10th Cir 1977], cert denied 435 US 926 [1978].)
The plaintiffs’ challenge to the regulation of certain semiautomatic weapons must fail for three additional reasons. First, all members of the military, as well as military uses of firearms, are exempted under the express terms of the ordinance (§ 47-5 [f]). Second, as plaintiffs have repeatedly argued, the guns subject to this law are not military weapons, but merely look like military weapons, since they are identical in action to sporting guns and are not capable of full automatic fire. Third, the plaintiffs have not alleged that they are members of the State or Federal National Guard nor that the banned weapons are in use by these military groups. This court is of the opinion, that at least since 1933, the State and Federal National Guard, have been the organized, and therefore, the "well regulated militia” of the Second Amendment (see, Perpich v Department of Defense, 496 US 334 [1990]; Maryland v United States, 381 US 41, 46 [1965]).
new York’s civil rights law
For many of the same reasons as stated above regarding the Second Amendment, the plaintiffs’ claim that the ordi *829 nance is in contravention of Civil Rights Law, article 2, § 4 must fail. The courts of this State have concluded that the language of Federal law interpreting the Second Amendment (which is identical in its language to article 2, section 4 of the Civil Rights Law) should be used in interpreting the provisions of this State law. Therefore, as noted above, in order to fall within its protection, the plaintiffs bear the burden of establishing that the gun itself will be used for the purpose specified in article 2, section 4, and that they have more than a mere technical association with an unorganized, reserve militia (United States v Hale, 978 F2d, supra, at 1020; Matter of Guida v Dier, 84 Misc 2d 110 [Sup Ct, Saratoga County 1975], mod on other grounds 54 AD2d 86 [3d Dept 1976]). The plaintiffs have failed to meet this burden.
BAN VS. REGULATION
Plaintiffs have cited no authority for the proposition that the State could not regulate possession of even military arms. Rather, relying on People ex rel. Darling v Warden (154 App Div 413, 422 [1st Dept 1913]; People v Rasco, 9 Misc 2d 739 [Kings County Ct 1958]), the plaintiffs contend that the possession of these guns cannot be banned. The plaintiffs urge that the current ordinance constitutes a ban. The plaintiffs base their claim upon the affidavit of Peter Burke. That affidavit states that the definition of an assault rifle contained in section 47-5 (a) (1) of the ordinance would "include virtually all semi-automatic rifles with detachable ammunition feeding devices commonly used for hunting and target shooting, whether configured to look like military style arms or not, and whether loaded with any ammunition at all.” For the reasons set out more particularly below, the court finds that the ordinance constitutes not a ban, but rather a reasonable regulation as to place and circumstances of possession (see, United States v Warin, 530 F2d 103, supra).
Section 47-5 (a) (1) of the ordinance reads as follows: "Any center fire rifle or shotgun which employs the force of expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which is loaded or capable of being loaded with a combination of more than six (6) cartridges in the ammunition feeding device and chamber combined. For the purposes of this section, a weapon is capable of being loaded if it is possessed by one who, at the *830 same time, possesses: (a) in the case of a rifle, a fixed or detachable ammunition feeding device which is attached to or utilized or capable of being attached to or utilized with such rifle and which has a capacity of more than five (5) cartridges; or (b) in the case of a shotgun, an ammunition feeding device which is attached to or utilized with or capable of being attached to or utilized with such shotgun and which has a capacity of more than five (5) cartridges. ” (Emphasis added.)
Section 47-5 (a) (2) provides that the addition of certain accessories to a semiautomatic center fire rifle or shotgun also constitutes the creation of an assault weapon; and, paragraph (3) prohibits certain types of stocks or grips on shotguns; and, paragraph (4) lists the 32 named rifles and shotguns.
Clearly if the ordinance merely limits the conditions or circumstances under which certain weapons may be possessed, it does not offend either the United States Constitution or Civil Rights Law, article 2, § 4 (United States v Warin, supra; People v Morrill, 101 AD2d 927 [3d Dept 1984]). The Colorado Supreme Court in Robertson v City & County of Denver (874 P2d 325, 333 [Sup Ct, May 2, 1994]) held that a statute that limits a mere 40 guns out of the over 2,000 available cannot be considered to be a ban. That court, in considering an ordinance similar to the one challenged here, concluded that the law was a reasonable exercise of police power. More importantly, a plain reading of ordinance No. 93-62 evinces that guns, not particularly named, fall within the authority of the law, only if they are possessed at the same time as a magazine having a capacity of more than five rounds.
On oral argument, plaintiffs’ counsel asserted that "with a couple possible exceptions”, semiautomatic rifles and shotguns were not only sold with magazines larger than five rounds, but that magazines of five rounds or less were virtually unavailable. This assertion apparently reflects a misunderstanding on the part of the plaintiffs regarding the availability of detachable box magazines, capable of holding no more than five rounds of ammunition.
In other arguments regarding the Civilian Marksmanship Program (discussed below), the plaintiffs have referred to three weapons, which they contend fall within the ban because of their magazine capacity. They are the M-l Gar and; the AR-15; and the M-1A. Plaintiffs have focused on those weapons because of their alleged value to the militia. Magazines capable of holding no more than five rounds are avail *831 able for each of these weapons.[1] Indeed the majority of semiautomatic rifles manufactured commercially have been produced with magazines capable of holding no more than five rounds.[2] Even military look-alike, semiautomatic rifles which have become popular, such as the Chinese SKS carbine, the American M-l .30 caliber carbine, the AK-47 and the AKS, are not banned by section 47-b (1) of the ordinance, since five round magazines are available for them.[3]
The ordinance, as drafted, does not even ban any particular style of weapon. For example, although it names the AR-15A-2 carbine, AR-15A-2 Delta H-bar and AR-15A-2 H-bar, all manufactured by Colt, it does not ban the possession of the identical guns when produced by other manufacturers.[4] It cannot be seriously argued that the present ordinance constitutes a ban on possession of all rifles and shotguns, all semiautomatic rifles or shotguns, or all semiautomatic rifles which appear to have mimicked the style of actual military rifles, without regard to the circumstances of possession.
FEDERAL PREEMPTION
The plaintiffs have alleged that the ordinance is preempted under the Supremacy Clause of the United States Constitution (US Const art VI), because of actual conflicts with legislation regarding the Civilian Marksmanship Program (10 USC §§ 4307-4317; 32 CFR 543-544), and because it interferes with the Federal imposition upon the States of the duty to *832 maintain an organized or well-regulated militia. Certain principles guide the analysis of Federal preemption of local laws. Absent a clear and manifest congressional purpose,, a local law cannot be assumed to be displaced by Federal law (Rice v Santa Fe El. Corp., 331 US 218 [1947]). In this regard, Federal preemption can be found to occur in a variety of ways: from the explicit terms of the Federal law prohibiting States from adopting contrary legislation (Wisconsin Pub. Intervenor v Mortier, 501 US 597 [1991]); from a pervasive scheme of Federal regulation making it a reasonable inference that Congress intended to dominate the field (Wisconsin Pub. Intervenor v Mortier, supra); from an actual conflict which occurs when compliance with both State and Federal law is a physical impossibility (Florida Lime & Avocado Growers v Paul, 373 US 132 [1963]); or where a State law stands as an obstacle to the accomplishment and execution of the congressional purpose (Hines v Davidowitz, 312 US 52 [1941]). At least one Federal Circuit Court has already held that a regulation of semiautomatic rifles does not interfere with the purposes Of the Civilian Marksmanship Program, and further, that the legislation creating the program did not intend Federal preemption (Fresno Rifle & Pistol Club v Van De Kamp, 915 F2d 723, supra; see also, Arnold v City of Cleveland, 67 Ohio St 3d 35, 616 NE2d 163, supra). In a virtually identical case as the one presented here, a Federal Magistrate concluded that no conflict could exist where Civilian Marksmanship Program activities could occur outside the limits of the City and weapons necessary to participate in the program could be made available through or stored at a location at which the authorized event occurs (Richmond Boro Gun Club v City of New York, US Dist Ct, ED NY). The enabling legislation for the Civilian Marksmanship Program demonstrates a clear intent of cooperation and not conflict between State and Federal law. For instance, provisions of this legislation permit gun clubs participating in the program to store and possess items provided by the director of the Civilian Marksmanship Program, so long as they are stored in conformity with local law (32 CFR 543.17).
The court further finds that there is no conflict between the stated purposes of the Civilian Marksmanship Program and the challenged ordinance. In the court’s opinion, it cannot be seriously argued that marksmanship can only be taught when a large capacity magazine is attached to a weapon. The techniques of controlled fire, timed fire, and combat reloading *833 remain unchanged whether 5 or 20 or 30 rounds are discharged. The plaintiffs have not produced the slightest evidence to indicate that a weapon fires differently, shoots less accurately, or is operated in a materially different fashion depending on the number of rounds contained in its detachable box magazine. Furthermore, as noted by the City in its responding affidavits, there are no licensed shooting galleries or ranges within the City of Rochester. Therefore, no competition or training conducted under the auspices of the Civilian Marksmanship Program could occur within the City limits, the only geographical area in which the law is applicable.
STATE PREEMPTION
Plaintiffs contend that the ordinance is invalid and unenforceable because the City is without authority to enact legislation in the area of gun control. They contend the State regulatory system evinces an intent to occupy the entire area, and that the ordinance conflicts with certain specific State statutes (General Municipal Law, art 6, § 139-d; Civil Rights Law, art 2, § 4; Penal Law arts 265, 400).
The principles which guide a determination of the existence of Federal preemption find strong parallels in New York State law. The power of the State Legislature over municipal corporations is, of course, “supreme and transcendent” (Matter of Brown v Board of Trustees, 303 NY 484, 488 [1952]; see, NY Const, art IX, § 2 [c] [ii] [10]; Municipal Home Rule Law § 10 [1] [ii] [a] [12]). Local laws may be ruled invalid as inconsistent with State law not only where an express conflict exists but also where the State has clearly demonstrated a desire to preempt the entire field, thereby precluding any further local legislation (Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91, 96-97 [1987]). However, if the State, by its legislative enactments, does not regulate the entire area of activities, a local law is not preempted merely because it prohibits conduct permitted by State law (Robin v Incorporated Vil. of Hempstead, 30 NY2d 347 [1972]; Incorporated Vil. of Nyack v Daytop Vil., 78 NY2d 500, 508 [1991]).
In the area of weapon regulation, the courts in this State have upheld local laws limiting possession and use (see, e.g., People v Judiz, 38 NY2d 529 [1976]; People v Ortiz, 125 Misc 2d 318 [upholding knife control law despite the inclusion of knives as dangerous weapons under article 265 of the Penal Law]; Grimm v City of New York, 56 Misc 2d 525 [Sup Ct, *834 Queens County 1968]). Clearly the State has not, either directly or indirectly, regulated all aspects of gun possession and use as to time, place and circumstance.
Furthermore, the ordinance does not conflict with the purpose or language of General Municipal Law § 139-d. That statute has as its intent the regulation of commercial storage of firearms and explosives. It does not evince a legislative intent to prohibit regulation by a municipality of the individual possession of semiautomatic rifles or shotguns (see, Report and Recommendation of the United States Magistrate Judge A. Simon Chrein, dated Feb. 23, 1994, in Richmond Boro Gun Club v City of New York, supra).
On the other hand, the court does find that 15 USC § 5001 (g) (i) and (ii) relating to air and spring guns and General Business Law § 870 et seq., establish an intent to fully regulate at the State and Federal level the manufacture, sale and possession of air guns, spring guns, and imitation arms. This conclusion is drawn from the express preemption language contained in 15 USC § 5001 (g) (i) and (ii), and the definition of "imitation weapon” contained in General Business Law § 871 (2), and the statement of legislative intent set forth in General Business Law § 870.
DISPOSITION OP WEAPONS
The plaintiffs contend that the limitation placed on an owner’s right to sell his gun constitutes a taking of property and an unlawful interference with the dominion and control of a property (NY Const, art I, §§ 6, 7 [a]; § 8; US Const 5th, 14th Amends). However, the plaintiffs have mischaracterized the ordinance. Section 47-5 (b) does not prevent the sale of any gun within the City of Rochester. It does not in any way seek to control the disposition of licensed firearms within the City, nor does it seek to control intrafamily transfer of any gun. It imposes no limits on gunsmiths or gun dealers, who are licensed to sell guns. It imposes no fees on the transfer of any gun. It places no limits at all upon City residents who wish to dispose of their guns outside of the City. It only limits an individual, whether a resident or not, from selling a gun, except through a licensed gun dealer, if such sale is to occur within the City of Rochester. The ordinance, therefore, does not deprive anyone of any property, and does not result in the taking of any property for public purpose or otherwise.
The plaintiffs’ contention that sections of the New York State and Federal Constitutions related to free speech are *835 violated by the limitation on the private advertisement for sale of guns within the City is in error. The United States Supreme Court has recognized that commercial free speech regarding lawful activity can be limited where substantial governmental interest is involved, and where the regulation adopted is narrowly drawn, and where it directly advances that governmental interest (Central Hudson Gas & Elec. v Public Serv. Commn., 447 US 557 [1980]). Conduct which is not constitutionally protected, and is regionally or nationally illegal cannot be solicited by public advertisement (see, Posadas De Puerto Rico Assocs. v Tourism Co. of Puerto Rico, 478 US 328 [1986]). Where that regulation is narrowly tailored, as it is here, to achieve the purpose of limiting the proliferation of illegally possessed firearms, it is not violative of the First Amendment (see, e.g., Ragin v New York Times Co., 726 F Supp 953 [SD NY 1989], affd 923 F2d 995, distinguishing Bigelow v Virginia, 421 US 809 [1975], and holding that the First Amendment does not guarantee the right to advertise for illegal conduct).
RIGHT TO SELF-DEFENSE
The plaintiffs allege that the ordinance limits their inalienable right to self-defense. Notwithstanding this claim, municipalities routinely regulate the discharge of firearms within their boundaries. More importantly, the ordinance does not regulate in any significant way the right to self-defense. The right to self-defense is delineated in article 35 of the Penal Law. That law recognizes, as the defense of justification, the use of certain kinds of force which would otherwise be illegal. No serious argument can be advanced that the limitation of the kinds of guns or the number of rounds available in a single magazine, detailed in the ordinance, is an important component of self-defense. Therefore, the ordinance has no impact on the statutory right to defend oneself.
DRUG AND ALCOHOL TESTING
The plaintiffs have challenged the provisions of the ordinance contained in section 49-5 (k) regarding chemical tests for the alcohol and drug content of the blood of individuals possessing firearms, rifles, shotguns, or air guns in public places. This challenge is based on a claim that section 49-5 (k) violates the Fourth and Fourteenth Amendments of the *836 United States Constitution, and parallel articles of the New York State Constitution.
The plaintiffs, by their own account, advocate the safe use of firearms. None of the plaintiffs have argued in any document before the court that they would consider or condone using firearms or other dangerous instruments while they were under the influence of drugs or alcohol. In fact, they are the precise type of individuals and corporate citizens who would be appalled and offended by the use of guns or other weapons by intoxicated persons.
Declaratory judgment actions are designed to be a vehicle to allow those who may be affected by a law, to challenge its validity without having to violate it. However, they do not eliminate "the cases and controversies” element requisite for any justifiable action. As noted by the Fourth Department in Phelan v City of Buffalo (54 AD2d 262, 264 [4th Dept 1976]): "Declaratory judgment is a proper remedy for determining legal relations of parties to a justiciable controversy [CPLR 3001]. Whether an individual has standing to seek such relief is largely determined by whether he has a matured legally protectable interest in the outcome of the case such as to assure concrete adverseness in the presentation of issues [Baker v Carr, 369 US 186]. One is not entitled to a declaratory judgment absent 'concrete legal issues, presented in actual cases, not abstractions’ (United Public Workers v Mitchell, 330 US 75, 89; Maryland Cas. Co., v Pacific Co., 312 US 270).”
The plaintiffs in this case have shown no controversy involving an immediate threat of injury arising from the obligation to consent to blood or alcohol tests as required by this ordinance. They therefore lack standing to seek declaratory relief relative to this provision (Schmidling v City of Chicago, 1 F3d 494 [7th Cir 1993], cert denied — US —, 114 S Ct 555 [1993]).
DELEGATION OF AUTHORITY TO THE CHIEF OF POLICE
Section 47-5 (m) (2) of the Municipal Code specifically provides that the chief of police may grant permits. That section limits those permits to persons seeking to shoot clay pigeons or to target shoot at ranges. As noted by the Federal Magistrate in Richmond Boro Gun Club v City of New York: "Under New York Law, 'there is no prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law *837 enacted by the legislature’. Levine v. Whalen, 39 NY2d 510, 384 NYS2d 72 [1976]. Such standards 'need only be described, and so detailed to fashion as is reasonably practical in light of the complexity of a particular area to be regulated’ ”. This ordinance grants the chief of police authority of a very specific nature, reasonably limited, in relation to the complexity of the particular area to be regulated. The ordinance does not, therefore, create an invalid delegation of legislative authority to the chief of police.
EQUAL PROTECTION
Section 47-5 (b) (4) of the ordinance lists several rifles and shotguns by name, and defines them as assault weapons, without reference to the capacity of the magazines associated with these weapons. For example, the ordinance specifically names the Colt AR-15A2 carbine, AR-15A2 Delta H-bar, and AR-15A2 H-Bar. It does not list the identical Eagle Arms EA-15, Olympic Arms AR-15 Service Match, Olympic Arms AR-15 Heavy Match, Olympic Arms CA-15, Quality Arms E-2, or the Stoner SR-25.[5] It further references the Springfield Armory BM-59 without making reference to the identical Italian made Beretta BM-59.
In People v Walker (81 NY2d 661, 668 [1993]), the New York State Court of Appeals detailed the guidelines to be used by New York courts in reviewing equal protection challenges under the State and Federal Constitutions. The Court there said " 'The equal protection clause does not mandate absolute equality of treatment but merely prescribes that, absent a fundamental interest or suspect classification, a legislative classification be rationally related to a legitimate State purpose’ ” (People v Parker, 41 NY2d 21, 25). In their memorandum in support of their motion for summary judgment, defendants have urged the rational relationship to a legitimate State purpose by claiming that "since the prohibitions on various types of weapons are rationally related to a legitimate State purpose of controlling violence and proliferation of firearms, the Ordinance must be upheld” (defendants’ mem, at 25). While the regulation of various types of weapons may indeed be related to a legitimate State purpose, the ordinance does not reference types of weapon, it references specific weapons by name, ignoring other identical weapons of the *838 same type. It further prohibits these weapons, without regard to the qualifications contained in section 47-5 (b) (1) and (2) (magazine capacity, etc.). As the court noted in Robertson v City & County of Denver (supra), so often referred to and relied upon by defendants, "the salient features of assault weapons which make them particularly threatening are their capability for a rapid rate of fire and the ability to fire many rounds without reloading” (Robertson v City & County of Denver, supra, n 16).
If this portion of the ordinance was permitted to stand, two citizens could potentially be treated in a wholly unequal fashion if they possessed identical AR-15’s made by different manufacturers. One would be subject to imprisonment, fine and loss of property; and the other would not be breaking the law. Moreover, two manufacturers, each producing identical weapons, would be treated unequally because one would be able to sell his weapons within the City of Rochester and the other would not.
As has been conceded during oral argument by the City, the inclusion of section 47-5 (b) (4) does not aid the City in achieving the stated goals of this legislation. All weapons listed in that section would be regulated under section 47-5 (b) (1) if they had the characteristics that justified the imposition of the prohibition in the first instance (e.g., the possession of a magazine capable of holding more than five rounds; see, Robertson v City & County of Denver, supra). This concession was, of course, compelled by the contents of exhibits submitted by defendants which were the basis for City Council’s determination that the restrictions were necessary. While the court is, of course, constrained to defer to the City Council on any state of facts which were known or might be presumed from known facts, here, the defendants have provided the basis for legislative action through the submission of exhibits. Careful review of the exhibits reveal no support for the notion that there is a difference in the danger posed to society by identical guns produced by different manufacturers, and no such distinction can be found through an exercise of reason. Therefore, to the extent that section 47-5 names individual weapons, and excludes others that are identical, it is a violation of the Equal Protection Clause of the United States Constitution, and it may not be enforced by the City.
THE GENERAL POLICE POWER
The City contends that the ordinance was adopted pursuant to its police power (NY Const, art IX; Municipal *839 Home Rule Law § 10; General Cities Law § 20 [13], [22]). Prior to determining the substance of this contention, there is a procedural matter which must be addressed. Specifically, the plaintiffs have urged the familiar rule that summary judgment may be granted, or resisted, only upon sworn affidavits of fact, and have contended that the defendants have defaulted in this obligation. However, the defendants have submitted sworn proof. This proof is in the form of the affidavit of Lois Giess, which sets forth the items, facts, and primary sources of information upon which the City Council relied in adopting the legislation. Contrary to plaintiffs’ contention, the City Council was not limited to enacting legislation only upon sworn evidence.
Now turning to the substantive issue, the New York Court of Appeals, in Lighthouse Shores v Town of Islip (41 NY2d 7, 11-12 [1976]), articulated the standard to be used by the courts in determining whether or not an ordinance adopted by a municipality is a valid exercise of the police power. "The exceedingly strong presumption of constitutionality applies not only to enactments of the Legislature but to ordinances of municipalities as well. While this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt and only as a last resort should Courts strike down legislation on the ground of unconstitutionality. The ordinance may not be arbitrary. It must be reasonably related to some manifest evil which, however, need only be reasonably apprehended. It is also presumed that the legislative body has investigated and found the existence of a situation showing or indicating the need for or desirability of the ordinance, and, if any stated facts known or to be assumed, justifies the disputed measure, this court’s power of inquiry ends.” It of course must be emphasized that this is not a review by the courts of the wisdom of a particular piece of legislation nor of the likelihood that the legislation will achieve the ends sought by the legislative body (see also, Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313 [1988]; Exxon Corp. v Governor of Md., 437 US 117 [1978]; New York State Club Assn. v City of New York, 487 US 1 [1988]). This standard is essentially the same for the review of an ordinance that places restrictions on individual conduct. " Tn order to be upheld as constitutional, a law which places some restriction upon an individual’s freedom of action in the name of the police power must bear *840 some reasonable relation to the public good.’ ” (People v Lee, 58 NY2d 491, 495 [1983] [citations omitted].)
Even where substantial evidence in the record demonstrates that the legislative objective will not be served by the local law, the courts may not intervene and overturn this law, unless there is no rational reason whatsoever for its adoption (Town of N. Hempstead v Exxon Corp., 53 NY2d 747 [1981]).
This is the classic "rational basis test” often spoken of in law. This test, and not the "strict scrutiny test”, must be utilized when, as here, no constitutionally protected conduct or fundamental right is sought to be regulated. It requires that there be some rational relationship between the statute and the conduct it seeks to regulate. The term "rational basis” requires only that some rational lawmaker could logically believe that the limitation could serve a legitimate public purpose that transcends the harm to the individuals effected by the statute (City of Cleburne v Cleburne Living Ctr., 473 US 432, 452 [1985] [concurring opn Stevens, J.]). In coming to the conclusion that there is a rational relationship between the conduct and the object of the ordinance, the lawmaker is free to rely not only on his own experiences and the evidence revealed as a result of his direct investigation, but also upon the experiences of other cities and localities which have confronted the same problem at an earlier time (City of Renton v Playtime Theaters, 475 US 41, 50-52 [1986]).
This court is not the first to be called upon to judge the rational relationship between the control of semiautomatic weapons and a legitimate municipal interest. In Robertson v City & County of Denver (874 P2d 325, supra), the court concluded that an assault rifle ban does not violate a fundamental right and that the fact that assault weapons account for one half of a percent of crimes in which guns were used, made its control and regulation rational. The Ohio Court of Appeals in City of Cincinnati v Langan (94 Ohio App 3d 22, 640 NE2d 200) similarly found that a semiautomatic ban was within the legitimate exercise of police power. In Quilici v Village of Morton Grove (695 F2d 261, cert denied 464 US 863), the court found that, since there was evidence that gun control might reduce accidental injuries, the ban of handguns was justified. Even those courts which have held that there is a constitutional or fundamental right to possess guns have concluded that semiautomatic guns may be regulated or banned (see, Arnold v City of Cleveland, 67 Ohio St 3d 35, 616 *841 NE2d 163 [1993], supra; Rabbitt v Leonard, 36 Conn Supp 108, 413 A2d 489 [1979]).
Our own State courts have upheld the New York City-regulation of rifles and shotguns in Grimm v City of New York (56 Misc 2d 525, supra) and in People v Ortiz (125 Misc 2d 318, supra) the court held that the regulation of knives of a certain length was a legitimate subject of municipal control under the general police power. Therefore, the court finds that the underlying investigation conducted by City Council presented a state of facts from which a rational relationship between the ordinance and a legitimate municipal interest may be presumed.
VAGUENESS
The plaintiffs have raised a challenge to that portion of the ordinance dealing with "air guns”. The plaintiffs claim that section 47-5 (13), which contains a definition of "air guns”, is vague and overbroad. They argue that the definition would include and make criminal, not only traditional air guns, but also such items as staple and nailing guns, slingshots, and many toys.
In order to survive the challenge that it is vague, an ordinance must give the average citizen notice of conduct which is prohibited; it must exclude by its language, discriminatory or arbitrary enforcement; and it must insure that no constitutionally protected conduct is criminalized (Papachristou v City of Jacksonville, 405 US 156 [1972]). As the Supreme Court noted in Grayned v City of Rockford (408 US 104, 108 [1978]): "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist the laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.” (See also, People v Smith, 44 NY2d 613.) An ordinance is overbroad when it sweeps within its reach constitutionally protected as well as unprotected activities (People v Ryan, 806 P2d 935, 939, cert denied 502 US 860; Village of Hoffman Estates v Flipside, Hoffman Estates, 455 US 489, 494-498).
The definition of "air gun” in section 417-5 (b) of the ordinance is both vague and overbroad. When read as a whole, *842 the law does not give individuals within the City of Rochester reasonable notice of prohibited conduct. Those charged with enforcement of the law would almost certainly be compelled to discriminatory enforcement to avoid the otherwise unintended result of arresting all housing contractors, handymen, and many of the City’s children for technical violations of the law.
CONCLUSION
Therefore, the court finds that the defendants have the right to enforce Rochester City ordinance No. 93-62 to the extent that it restricts the possession of semiautomatic rifles and shotguns, possessed simultaneously with ammunition feeding devices, resulting in a combined capacity of six rounds or more, and/or with the accessories specified in section 47-5 (b) (2) of that ordinance. Additionally, the defendants have the right to enforce all other portions of the ordinance, except those portions which seek to regulate guns which are named by manufacturer, and to regulate air guns and imitation weapons.
Consequently, the plaintiffs’ motion for summary judgment and the defendants’ cross motion are denied in part and granted in part.

. See, Springfield, Inc., M-1A Parts and Accessories Retail Price List, Stock No. MA508 and MA509, described as five round box and sporter magazines for the M-1A. See also, Quertermous and Quertermous, Modern Guns Identification and Values, revised 9th ed, 1993, at 166 (Colt AR-15 in caliber .223, listed as having a five round magazine, standard; see also, World Guide to Gun Parts, catalogue for the gun parts corporation of West Hurley, New York, 18th ed, at 596, Part No. G 91 for the M-l Garand, .30 caliber rifle Garand Clips 5-shot, 5 at $12.50 * * * $3.50 each).

. Quertermous and Quertermous, Modem Guns Identification and Values, revised 9th ed, op. cit., see, e.g., at 158 (Browning BAR); at 166 (Colt AR-15); at 173 (Harrington and Richardson, Model No. 308); at 279 (Rugar Mini-14 and Rugar Mini-30), etc.

. See, "Gun List, The Indexed Firearms Paper”, vol 11, No. 18, Sept. 9, 1994, at 9, item No. 27, "SKS Five Round Mags”; see also, World Guide to Gun Parts, op. cit., at 79-80; AK-47 and AKS five round magazines available for $19.95 and US M-l carbine five round magazines available for $6.95.

. See, e.g., Wood, Firearms Assembly and Disassembly Guide, part IV, centerfire rifles, rev ed, at 66; Eagle Arms EA-15, Olympic Arms AR-15 Service Match; Olympic Arms, AR-15 Heavy Match; Olympic Arms, CAR-15 are identical guns.

. See, Wood, Firearms Assembly and Disassembly Guide, part IV, center-fire rifles, rev ed, at 66; Werner, Gun Digest 1995, 49th ed, at 328-332.