OPINION OF THE COURT
Michael Gerstein, J.
Defendant Rashawn Handsome moves to dismiss a complaint in this court charging him with violating Penal Law § 265.01, criminal possession of a weapon in the fourth degree. The weapon, specifically a loaded .44 caliber Magnum revolver, was allegedly recovered in defendant’s apartment in Brooklyn’s Wyckoff Gardens, a New York City Housing Authority (NYCHA) building complex in Boerum Hill, upon execution of a search warrant. Defendant argues that Penal Law § 265.01 is unconstitutional under the Second Amendment, principally relying on Parker v District of Columbia (478 F3d 370 [DC Cir 2007]), which held unconstitutional the District of Columbia (DC) handgun licensing statute.
We hold Penal Law § 265.01 fully constitutional under the Second Amendment. Parker neither requires nor persuades us to find our statute unconstitutional. Rather, we find the reasoning of Parker to be deeply flawed, such that even if its holding were to be deemed applicable to our statute, which it is not, we would decline to follow it unless required to do so by our appellate courts.
The defendant further moves for dismissal of the accusatory instrument for facial insufficiency pursuant to CPL 170.30 (1) (a); 170.35 (1) (a)-(b); 100.15, and 100.40; to controvert the warrant under CPL article 690; and to reserve the right to make additional motions pursuant to CPL 255.20 (3). We find none of these arguments persuasive and deny the motion in its entirety, except to allow further motions as permitted by CPL 255.20.
*545 I, Factual and Legal Background
Pursuant to a search warrant executed on November 2, 2006, in defendant’s apartment on the 20th floor at 130 3rd Avenue, part of the Wyckoff Gardens housing complex in Brooklyn, defendant was accused of possessing a loaded .44 caliber Magnum revolver, a .38 caliber revolver, a .25 caliber semiautomatic pistol, two .25 caliber “silver magazines,” and a 9 millimeter cartridge, all allegedly recovered from a sneaker box inside a closet, in a room in which defendant was standing. Defendant was charged with three counts of criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [1]), a class A misdemeanor.
The People have served and filed a statement notice under CPL 710.30 (1) (a), alleging that the defendant stated in substance “there are weapons inside the closet inside the sneaker box”; a supporting deposition signed by the arresting officer, Detective Timothy Sheridan; a firearm examination report indicating that the .44 caliber Magnum revolver was operable; and a statement of readiness, which converted one count of Penal Law § 265.01 (1).
Defendant’s Motion to Dismiss the Complaint Based on the Alleged Unconstitutionality of Penal Law § 265.01 (1) is Denied
Penal Law § 265.01 (1) imposes liability for the possession of “any firearm.” Defendant argues that the Second Amendment protects the individual right to keep and bear arms, relying on Parker, Justice Clarence Thomas’ concurring opinion in Printz v United States (521 US 898, 936 [1997]) and “an eminent and growing body of scholarship” which, defendant contends, is reshaping the right to bear arms as a personal right, binding upon the states. (Defendant’s affidavit at 6.)
Parker was brought as affirmative litigation to challenge a DC statute, including a prohibition of new handgun registration and restrictions on the transport of weapons. The court, in a divided opinion, Judge Lecraft Henderson dissenting, found that the wording of the Amendment’s guarantee, “the right of the people to keep and bear arms,” and specifically the choice of the word “people,” conferred an individual right, in accord with that word’s usage elsewhere in the Bill of Rights. (Parker at 381.) The court further found that the Second Amendment protected a preexisting right of individuals both to keep arms for their private use in hunting or self-defense, and to bear them, in civic use, in service of a militia. (Parker at 382-383.) *546 Given the other individual rights enshrined in the Constitution, and the Tenth Amendment’s reservation clause, the court held that “[t]he Second Amendment would be an inexplicable aberration if it were not read to protect individual rights as well.” (Parker at 383.) The Parker court therefore held that the Amendment barred all but reasonable restrictions on the individual right to bear arms, and struck portions of the DC statute as unconstitutional.
In Printz v United States (supra), the Supreme Court invalidated provisions of the Federal Brady Handgun Violence Prevention Act on state sovereignty grounds. In his concurrence, Justice Thomas ventured that the provisions could also be struck down under the Second Amendment, speculating:
“If . . . the Second Amendment is read to confer a personal right to ‘keep and bear arms,’ a colorable argument exists that the Federal Government’s regulatory scheme, at least as it pertains to the purely intrastate sale or possession of firearms, runs afoul of that Amendment’s protections. As the parties did not raise this argument, however, we need not consider it here.” (Printz v United States, 521 US at 938-939 [Thomas, J., concurring].)
For the following reasons, we decline to follow defendant’s argument that these interpretations of the Second Amendment render Penal Law § 265.01 unconstitutional facially or as applied.
A. The Second Amendment Has Not Been Made Applicable to the States
US Constitution Second Amendment provides, “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” As the Supreme Court has repeatedly held, this language limits only the power of Congress. (United States v Cruikshank, 92 US 542 [1875]; Presser v Illinois, 116 US 252 [1886]; Maxwell v Dow, 176 US 581, 597 [1900]; Twining v New Jersey, 211 US 78, 82 [1908].) The right has never been found applicable to states, either directly or through the Fourteenth Amendment, and provides no bar to state regulation such as Penal Law § 265.01. (See e.g. Fresno Rifle & Pistol Club, Inc. v Van De Kamp, 965 F2d 723 [9th Cir 1992].) Previous challenges to Penal Law § 265.01 (1) and other weapons regulations in New York State have failed on these grounds. (Bach v Pataki, 408 F3d 75 [2d Cir 2005] [New York’s handgun licensing scheme *547 is not unconstitutional under the Second Amendment]; Maloney v Cuomo, 470 F Supp 2d 205, 214 [ED NY 2007] [Penal Law § 265.01 (1) is not barred by the Second Amendment]; Citizens for Safer Community v City of Rochester, 164 Misc 2d 822 [Sup Ct, Monroe County 1994].)
Defendant concedes these points, but relies on the recent holding in Parker, arguing that in light of that case, the position that the Second Amendment does not apply to the states is “untenable.” (Defendant’s affidavit at 6.) The law invalidated in Parker, however, was a federal regulation, as the case itself notes: “the Second Amendment is one of the few Bill of Rights provisions that has not yet been held to be incorporated through the Fourteenth Amendment . . . The District of Columbia is a Federal District, ultimately controlled by Congress.” (Parker, 478 F3d at 391 n 13.)
The law review articles cited by the defendant, many of which also appear in Justice Thomas’ concurrence, belong to a separate academic arena: the question of whether the Second Amendment confers a personal, individual right to bear arms, or merely protects the collective right to bear arms within the context of a well-regulated militia. The majority of appellate federal opinions have interpreted the Second Amendment as a protector of state militias only, relying on Supreme Court precedent, the wording of the text, and the historical context in which the Second Amendment was enacted.[1] More recently, a growing number of firearm enthusiasts, groups like the National Rifle Association, and some individual rights scholars (Adam Liptak, A Liberal Case for the Individual Right to Own Guns Helps Sway the Federal Judiciary, New York Times, May 7, 2007, at 1), as well as two federal appellate courts (the District of Columbia in Parker and the Fifth Circuit in United States v Emerson [270 F3d 203 (5th Cir 2001)]), have argued that the Second Amendment confers an individual right to own firearms.[2] We discuss that point below.
B. Even if the Second Amendment Were Made Applicable to the States, the Amendment Does Not Confer an Individual Right to Bear Arms That Would Invalidate Penal Law § 265.01
The argument that the Second Amendment confers an individual right to bear arms conflicts with Supreme Court prece *548 dent, the plain meaning of the text, and the historical context of its enactment.[3] Aside from Parker, only one other federal circuit, in dicta, has shared defendant’s “individual rights” interpretation of the Second Amendment. (See United States v Emerson, supra.) Only Parker has invalidated a law on these grounds. Parker and Emerson are in direct conflict with decisions in the First, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits, which have interpreted the Second Amendment as a collective right, attaching only to state militias, and not as an individual right.[4] The Second Circuit, which has not yet decided a case squarely on that issue, has noted that “the right to possess a gun is clearly not a fundamental right.” (United States v Toner, 728 F2d 115, 128 [2d Cir 1984].)
The last Supreme Court decision to analyze the scope of the Second Amendment, United States v Miller (307 US 174 [1939]), clearly supports a “collective rights” interpretation of its text. The defendants in that case were charged with a violation of the National Firearms Act for transporting an unregistered, short-barreled shotgun across state lines. The lower court accepted the defendants’ argument that the statute was barred by the Second Amendment, quashing the indictment. The Supreme Court disagreed, finding:
“In the absence of any evidence tending to show *549 that possession or use of a [shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.” (United States v Miller, 307 US at 178 [emphasis added].)
The Court further held that the declaration and guarantee of the Second Amendment were made “[w]ith obvious purpose to assure the continuation and render possible the effectiveness” of state militias, and that the Second Amendment must be interpreted with that end in view. (Id.)
The holding in Miller has never been disturbed, and the Supreme Court has never revisited the issue, deciding challenges to weapons restrictions on other grounds. (See e.g. Printz v United States, 521 US 898 [1997] [invalidating portions of a federal weapons regulation, the Brady Law, under the anticommandeering principle of the Tenth Amendment]; United States v Lopez, 514 US 549 [1995] [invalidating the Federal Gun-Free School Zones Act under the Commerce Clause]; Lewis v United States, 445 US 55 [1980] [finding that a federal firearm statute did not violate the Due Process Clause of the Fifth Amendment].)
Moreover, as recently as 1980, in a footnote in Lewis v United States (supra), the Court cited Miller to hold that “the Second Amendment guarantees no right to keep and bear a firearm that does not have ‘some reasonable relationship to the preservation or efficiency of a well regulated militia.’ ” (Lewis v United States, 445 US at 65 n 8 [1980].) The belief that the Second Amendment confers an individual right to bear arms therefore requires rejection of viable Supreme Court precedent and half of the Amendment’s text. We instead reject defendant’s invitation to ignore the prefatory clause of the Amendment, or, by interpretation, render it meaningless.
The individual rights theory of the Second Amendment, as it was analyzed in Parker, rests primarily on the isolated reading of the phrase “the right of the people,” and on a theoretical preexisting right to both keep and bear arms, for private and public use. (Parker, supra.) Analyses of the context and enactment of the Amendment, however, provide overwhelming evi *550 dence that the intention of the Second Amendment’s drafters was limited to safeguarding state militias from federal regulation. (David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich L Rev 588 [Dec. 2000]; Silveira v Lockyer, 312 F3d 1052, 1087 [9th Cir 2002].)
As the Silveira court describes in a detailed historical analysis,[5] the Second Amendment came about as a compromise in the conflict between Federalists and the Anti-Federalists about the allocation of military power between the national government and the states. (Silveira v Lockyer, 312 F3d at 1076-1087 [9th Cir 2002].) The Anti-Federalists feared that a federal standing army would replace the states’ militias and endanger the freedom of the states, but eventually recognized the need for a stable national force. (Id.; Yassky at 589-605.) Article I, § 8 of the US Constitution provided for dual federal and state control of the militias, but was insufficient to appease the Anti-Federalist fears. The Second Amendment was drafted to provide the state militias with additional protection from the federal government. (Id.) The concern that sparked the debates surrounding its enactment was the protection of state militias, not the individual right to possess a weapon. (Silveira v Lockyer, 312 F3d at 1076.)[6]
This is consistent with the Amendment’s text. As the Supreme Court held in Miller (supra), the Second Amendment should be interpreted in light of its prefatory clause, “[a] well regulated Militia, being necessary to the security of a free State.” The individual rights argument diminishes the importance of this clause, particularly the word “militia,” which also appears in contemporaneously enacted provisions of the Constitution and in the Articles of Confederation. Article I, § 8 (15) and (16) of the United States Constitution grants Congress the power “[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.” Article VI of the Articles of Confederation provides that “every State shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered.” Similarly, the phrase “to keep and bear Arms” bore a specifically military connota *551 tion. (See e.g. Petition for Writ of Certiorari [2007 WL 2571686 (Sept. 4, 2007)] from Parker v District of Columbia, 478 F3d 370 [2007], filed sub nom. District of Columbia v Heller, 552 US —, 128 S Ct 645 [2007]; Yassky at 618-621 [citing the Declaration of Independence[7] and various contemporary texts employing the phrase “bear arms” to imply military use].) The “militia” referred to in the Second Amendment was not a miscellany of citizens individually armed, but a well regulated “state military force to which the able-bodied male citizens of the various states might be called into service.” (Silveira v Lockyer, 312 F3d at 1071.)
Since the Second Amendment’s enactment, these “well regulated” state militias have either disappeared or been swept into the National Guard. (Yassky at 623.) As Yassky notes in his analysis of the Amendment, the Civil War, the New Deal and the Civil Rights revolution have shifted power, including military power, from the states to the federal government. (Yassky at 629-644.) With the vanishing of the state militias— the structures the Second Amendment was intended to protect— the Second Amendment has lost much of its original purpose. (See generally Silveira v Lockyer, supra-, Yassky.) The individual rights argument is flawed because it seeks to manipulate this vestige of an eighteenth century federal structure into something the Founders never intended it to be: a right for every individual to own firearms for their private, civilian use.
The notion of a constitutional individual right to own weapons that might be as sacred as that of free speech,[8] as well as being at odds with the Amendment’s purpose, is also undermined by the fact that the use of guns outside of military service has always been subject to broad regulation. (See e.g. Heller Petition for Writ of Certiorari, 2007 WL 2571686, *16, citing Saul Cornell and Nathan DeDino, A Well-Regulated Right: The Early American Origins of Gun Control, 73 Fordham L Rev 487, 508-509 [2004].)
The need to regulate guns, moreover, has arguably become greater given the nationwide proliferation of deaths and injuries caused by privately owned guns. Since the DC Circuit Court’s *552 decision in Parker earlier this year, DC endured 750 robberies with firearms, 520 assaults with firearms, and 111 homicides.[9] In the United States, more than 30,000 people each year are killed by firearms in murders, suicides, and accidents. Another 65,000 suffer from gun injuries.[10] In New York State, 1,000 people die from gunshot wounds each year, and hundreds more are maimed.[11] Police officers are at particular risk from illegal guns, including:
• Police Officer Dillon Stewart, who was shot six times and mortally wounded during a car chase in Kings County, in 2005. (Michael Brick and Anahad O’Connor, Guilty Verdict in Murder of Police Officer, New York Times, Oct. 11, 2007.)
• Police Officers Russel Timoshenko and Herman Yan, who were shot and wounded in Kings County on July 10, 2007, after pulling over a vehicle they suspected was stolen. (John Holusha and Al Baker, 2 Police Officers Shot During Brooklyn Traffic Stop, New York Times, July 9, 2007.) Officer Timoshenko died five days later. (Amy Westfeldt, Wounded New York Police Officer Dies, Washington Post, July 15, 2007.) The alleged perpetrators were recently arraigned in our courthouse.
• Auxiliary Police Officers Nicholas Pekearo and Yevgeni Marshalik, who were shot and killed in March 2007, while patrolling, unarmed, in Greenwich Village. (Bradley Hope, Two Auxiliary Officers Killed in Greenwich Village, New York Sun, Mar. 15, 2007.)
• Police Officer Rory Mangra, who was shot in the leg *553 on March 27, 2007, in Brooklyn’s Park Slope. (Lisa L. Colangelo, Jotham Sederstrom and Michael White, Cop shot in Brooklyn, New York Daily News, Mar. 28, 2007.)
• Police Officer Ramon Suarez, who was shot and critically wounded while patrolling undercover in Brooklyn, on February 10, 2007. (Cara Buckley, Policewoman’s Husband Charged in Shooting of Plainclothes Officer, New York Times, Feb. 11, 2007.)
Along with the police officers, who are armed and trained to serve the city, children are also at risk of stray bullets, including the following, some of whom were shot and killed subsequent to submission of defendant’s motion.
• On October 19, 2007, 15-year-old Jose Batista was shot in the abdomen and killed a block away from his home in Harlem. (Cara Buckley and Annie Correal, Teenage Boy Is Shot Dead and Another Is Injured, New York Times, Oct. 21, 2007.)
• Within the space of three weeks, three children aged 13, 3, and 16 were shot in Brooklyn, including 16-year-old Talvin Alves, who was shot in the head and killed on October 14, 2007, when he peered out of his window to find the source of the gunfire he heard. (Jen Chung, Third Child Hit in Brooklyn Gunfire, Gothamist, Oct. 16, 2007; John Eligon, Boy Shot at Window Is Mourned, New York Times, Oct. 14, 2007.)
• On August 27, 2007, 12-year-old Kimberly Desvignes was shot in her side outside a grocery store in Crown Heights, Brooklyn, while walking home with her seven-year-old brother. (Tina Moore, Tamer El-Ghobashy and Dave Goldiner, Outrage grows as bullets fly in city and children are hit, New York Daily News, Oct. 15, 2007.)
All of this, while tragic, would not prevent us from holding the statute invalid if the Constitution required it, but it does not. Defendant’s argument not only conflicts with the overwhelming historical, textual and legal evidence that the Second Amendment was not intended to confer an individual right to own weapons, but further disregards the tens of thousands of civilian deaths caused each year by firearms. The cause of these *554 deaths, the private ownership of weapons unrelated to a “well-regulated” militia, was not protected by the Second Amendment when it was drafted, and it is not today.[12]
C. The Statute is Not Unconstitutional as Applied
The defendant urges us to find the statute unconstitutional as applied to him based on similar arguments. Defendant asserts that Parker held that only “reasonable restrictions” on an individual’s right to bear arms would pass muster under the Second Amendment.[13] The complaint here contains no allegations that defendant possessed the weapon outside his home, under the influence of alcohol, or in violation of any reasonable restriction on his right to bear arms, and defendant thus urges us to find the statute unconstitutional as applied to him (defendant’s affidavit at 9).
The Second Amendment does not confer an individual right to bear arms, and does not affect state legislation. We therefore need not determine whether the Penal Law fits the standard set forth in Parker. The fact that the weapons were found in defendant’s home is not relevant to the law under which he is charged. (Compare Penal Law § 265.01 [4].) Accordingly, we decline to find the statute, Penal Law § 265.01 (1), unconstitutional under the Second Amendment.
Moreover, unlike the plaintiffs in Parker, each of whom professed an allegedly valid reason for owning a gun barred by what those plaintiffs assert to be a total ban on handguns enacted by the District of Columbia, and the plaintiffs in Silveira v Lockyer (supra), two of whom were members of the California National Guard and combat veterans, another of whom was a police officer, and still another of whom was a correctional *555 officer (Silveira, 312 F3d at 1059 n 7), defendant Handsome has asserted no reason whatever as to why he should be allowed to have a loaded .44 Magnum revolver in his apartment in the Wyckoff Housing Project.
Defendant Handsome does not assert that he is a member of the National Guard, the closest contemporary equivalent to the militia referred to in the Second Amendment, nor does he assert an intention to apply for membership in the Guard. He does not claim to be a member of any organized or unorganized militia, or assert any purpose at all for possessing a handgun.
Unlike the DC statute struck down in Parker, which was held, in practice, to constitute a total prohibition, rather than a regulation of handguns (Parker at 400), New York State has established a procedure for citizens to apply for permits to possess and carry concealed weapons, by application to the Police Commissioner. (See Penal Law § 400.00 et seq.) Should the Commissioner deny a permit, there exists recourse to the court by means of CPLR article 78 to the New York State Supreme Court, the determination of which is itself reviewable on appeal.
Thus, Handsome might have applied to the Police Commissioner for a permit, and, if his application were denied,[14] he could have sought judicial review. He does not claim to have made any application.[15] Had he done so, the Commissioner would have been able to inquire as to his professed reasons for wanting a gun. The Commissioner would have noted that defendant resides on the 20th floor of a building within Wyckoff housing projects, a NYCHA property which, this court takes judicial notice (the building being within walking distance of our courthouse), houses many young children and senior citizens. He would have also noted that according to the information obtained at arraignment for bail purposes, defendant, who was then 19 years old, appears to have dropped out of high school, and was without any employment. Moreover, while not controlling, the discovery served in the case indicates that the police department believes defendant to be a member of an organized gang. All of this would have presumably been investigated by the Commissioner, had defendant applied for a permit.
*556 The Second Amendment protects the right to bear arms for members of state militias, not members of organized gangs. Parker itself recognizes that the right of an individual to bear arms is subject to reasonable restriction. (Parker at 399.) We have no doubt that the Parker court itself, and the scholars cited by Justice Thomas, would find reasonable a restriction prohibiting possession of firearms by a suspected gang member residing in public housing whose age bars him from purchasing alcoholic beverages, let alone possessing handguns.
While the wisdom, or lack thereof, of Penal Law § 265.01 is not within the scope of our review, we can surely note that the statute was enacted pursuant to the state’s police power, and is more than rationally related to the end it seeks to accomplish, limiting gun violence and accidents which have caused many deaths and injuries. (See e.g. Citizens for Safer Community v City of Rochester, supra.) As a trial court, we proceed cautiously before invalidating a statute which appears to have enjoyed decades of Supreme Court acceptance, and adopting defendant’s arguments founded on a revisionist view of the Constitutional Convention, which view is far from generally accepted.
The Complaint is Facially Sufficient
In order to be sufficient on its face, an accusatory instrument must allege facts sufficient to provide reasonable cause to believe that the defendant committed the offenses charged. (CPL 100.40 [4] [b]; People v Dumas, 68 NY2d 729 [1986].) Defendant argues that the complaint is facially insufficient because it fails to allege that the defendant was not licensed to possess the weapon. We disagree.
Penal Law § 265.20 provides several pages of exemptions from criminal liability under the statutes criminalizing weapons possession. Among these, Penal Law § 265.20 (a) (3) exempts those licensed to possess a pistol or revolver. These exemptions are contained separately from the statute under which the defendant is charged, and are therefore defenses to be raised at trial. (People v Kohut, 30 NY2d 183, 187 [1972] [“(e)ssential allegations are generally determined by the statute defining the crime . . . when the exception is found outside the statute, the exception generally is a matter for the defendant to raise in defense”].) The People are not required to disprove every possible defense at this stage of the proceedings. (See People v Santana, 7 NY3d 234 [2006]; People v Bingham, 263 AD2d 611 [3d Dept 1999].)
*557 The defendant nevertheless argues that the Second Amendment compels us to displace the general rule set forth in People v Kohut (supra), and to read into the statute at least the exemption for licensed weapons. (Defendant’s affidavit at 14.) Common sense, he argues, dictates that a greater showing than mere possession is required. Setting aside the constitutional thread of this argument, which we have already discussed, we decline to insert any further language into Penal Law § 265.01. The plain language of Penal Law § 265.01 criminalizes possession of “any firearm.” (Penal Law § 265.01 [1].) Had the legislature intended to narrow the scope of that restriction, they could have done so, as they did elsewhere in that chapter. (See e.g. Penal Law § 265.02 [4] [criminalizing possession of a loaded firearm except if the possession takes place in the defendant’s home]; and Penal Law § 265.01 [3] [criminalizing possession of a rifle or shotgun on school grounds, except in forestry lands, without the school’s permission].) Requiring the People to disprove the 23 exemptions concerning firearms listed in Penal Law § 265.20 in every case brought under Penal Law § 265.01 (1) would defy “common sense and reasonable pleading.” (People v Santana, 7 NY3d at 237, quoting People v Devinny, 227 NY 397, 401 [1919].) Defendant’s motion to dismiss the complaint for facial insufficiency is therefore denied.
Defendant’s Motion to Controvert the Search Warrant is Denied
Defendant argues solely that the warrant is invalid because it may have been based on stale evidence, and urges this court to provide defendant with an unredacted copy of the search warrant in this case. This portion of defendant’s motion is denied on both counts.
The warrant in this case was issued on October 31, 2006 by Supreme Court Justice Cheryl E. Chambers, upon testimony of Detective Timothy Sheridan of the Brooklyn South Gang Squad and a confidential informant. According to the unredacted search warrant materials in our possession, the confidential informant observed a weapon in the defendant’s home shortly before the search warrant application. This delay is insufficient to render the evidence stale. (People v Williams, 249 AD2d 343 [1998] [two-week delay between the informant’s observations of the defendant’s alleged drug operation and the issuance of the warrant did not render the evidence stale]; People v Mendez, 199 AD2d 182 [1st Dept 1993] [in a weapons possession case, *558 four-day-old information was not stale]; see also People v Kane, 175 AD2d 881 [2d Dept 1991]; People v Padilla, 132 AD2d 578 [2d Dept 1987]; People v Clarke, 173 AD2d 550 [2d Dept 1991].) In our case, the time parameters are within those found sufficient in People v Williams (supra), and People v Mendez (supra).
Given that the evidence supporting the warrant was not stale, we decline to provide defendant with an unredacted copy of the search warrant materials. (See People v Serrano, 246 AD2d 430 [1st Dept 1998], affd as mod 93 NY2d 73 [1999] [court properly withheld search warrant materials where disclosure would have endangered ongoing investigations and the safety of the confidential informant]; People v Rodriguez, 182 AD2d 439 [1st Dept 1992], lv denied 81 NY2d 793 [1993], cert denied 510 US 831 [1993] [a court may issue a protective order limiting discovery for good cause].)
Reservation of Rights
The branch of defendant’s motion seeking the right to make further motions is granted to the extent provided for by CPL 255.20 (3).
Conclusion
Accordingly, defendant’s motion is denied in its entirety, except that his motion to reserve his rights to make further motions is granted to the extent provided for by CPL 255.20 (3).

. See Silveira v Lockyer, 312 F3d 1052 (9th Cir 2002).

. A comprehensive discussion of these different schools of Second Amendment interpretation precedes the Ninth Circuit’s interpretation of the Amendment in Silveira v Lockyer (312 F3d at 1060-1066).

. See Silveira v Lockyer, supra; David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich L Rev 588 (Dec. 2000).

. These decisions, cited in Silveira, include Gillespie v City of Indianapolis (185 F3d 693 [7th Cir 1999], cert denied 528 US 1116 [2000]); United States v Wright (117 F3d 1265 [11th Cir 1997], cert denied 522 US 1007 [1997]); United States v Rybar (103 F3d 273 [3d Cir 1996], cert denied 522 US 807 [1997]); Love v Pepersack (47 F3d 120 [4th Cir 1995], cert denied 516 US 813 [1995]); United States v Hale (978 F2d 1016 [8th Cir 1992], cert denied 507 US 997 [1993]); Thomas v Members of City Council (730 F2d 41 [1st Cir 1984] [per curiam]); United States v Oakes (564 F2d 384 [10th Cir 1977], cert denied 435 US 926 [1978]); and United States v Warin (530 F2d 103 [6th Cir 1976], cert denied 426 US 948 [1976]; see also Parker at 409 [Lecraft Henderson, J., dissenting] [“Under United States v Miller, . . . the Second Amendment’s declaration and guarantee that ‘the right of the people to keep and bear Arms, shall not be infringed’ relates to the Militia of the States only”]); United States v Parker (362 F3d 1279, 1284 [10th Cir 2004], cert denied 543 US 874 [2004] [“an individual has a right to bear arms, but only in direct affiliation with a well-organized state supported militia”]; Arnold v Cleveland, 67 Ohio St 3d 35, 39, 616 NE2d 163, 166 [1993] [“(t)he question as to whether individuals have a fundamental right to bear arms has, seemingly, been decided in the negative under the Second Amendment to the United States Constitution”]). The Second Circuit has not yet decided a case squarely on that issue (but see United States v Toner, 728 F2d 115, 128 [2d Cir 1984] [noting that “the right to possess a gun is clearly not a fundamental right”]).

. See Silveira, 312 F3d at 1071, 1073, 1076-1087.

. Indeed, almost all of the debate over James Madison’s proposed draft of the Second Amendment focused on a clause exempting religious objectors from bearing arms. (Yassky at 604.) The ratification debates were almost entirely devoid of any discussion regarding an individual right to bear arms. (Silveira v Lockyer, 312 F3d at 1082.)

. “[T]he present King of Great Britain . . . has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country.” (Declaration of Independence para 28 [US 1776].)

. Notwithstanding the First Amendment, a state may regulate speech “directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action.” (Brandenburg v Ohio, 395 US 444, 447 [1969].)

. These figures compiled as of October 10, 2007. (See District of Columbia Metropolitan Police Department, Crime Statistics Report and Crime Map, available at http://crimemap.dc.gov/presentation/report.asp.) It is unclear from the Department’s statistics how many of the homicides DC experienced in that time involved firearms. According to the United States Department of Justice, however, 67.9% of nationwide murders in 2006 involved firearms. (Dept of Justice, 2006 Crime in the United States, available at http://www.fbi.gov/ucr/cius2006/offenses/expanded_information/ data/shrtable_06.html.)

. (Brief of plaintiffs at 9; City of New York v Beretta U.S.A. Corp., US Dist Ct, ED NY, No. 00-3641, July 20, 2000.) While that number has been substantially reduced in the last decade, it remains significant.

. Assembly Speaker Sheldon Silver, Press Release, Assembly Passes Comprehensive Gun Package (Apr. 25, 2007).

. The Parker plaintiffs, purporting to rely on constitutional law while eschewing “social science” arguments, are quite clear in their view that “the real-world results of the city [of DC’s] 31-year experiment with gun prohibition are quite stark: It has been a complete failure.” (Brief in Response to Heller Petition for Writ of Certiorari, 2007 WL 2962912, *27 [Oct. 4, 2007].) The proper place for such arguments as to the wisdom of gun laws, such as Penal Law § 265.01 is, of course, the legislature rather than the courts. The function of the court is to interpret the law, and not to determine the wisdom of Penal Law § 265.01, or any other statute. We do not sit as a super-legislature, notwithstanding the passions of those on either side of the debate surrounding the gun laws.

. However, the Parker plaintiffs themselves argued that “[t]he District of Columbia’s complete ban on functioning firearms is unique.” (Brief in Response to Heller Petition for Writ of Certiorari, 2007 WL 2962912, *6.) “[T]he question is whether the District of Columbia may ban all functional firearms.” (Id. at 18.)

. It appears that Handsome, who was 19 years old at the time of the alleged incident, would have been presumptively ineligible by his age for a license, as the minimum age is 21 (except for honorably discharged military veterans). (Penal Law § 400.00 [1] [a].)

. Nor did he bring an action to declare the statute unconstitutional, as did the plaintiffs in Parker.