896 F.Supp. 276 (1995)
RICHMOND BORO GUN CLUB, INC., National Rifle Association of America, New York State Rifle and Pistol Association, Inc., and John Does I Through VI, Plaintiffs,
v.
CITY OF NEW YORK, New York, and Lee P. Brown in his official capacity as Police Commissioner for the City of New York, Defendants.
No. CV 92-151(RR).
United States District Court, E.D. New York.
August 10, 1995.
*277 *278 *279 Susan Courtney Chambers, New York City, Stephen P. Halbrook, Fairfax, VA, Richard E. Gardiner, Legislative Counsel, National Rifle Association, Washington, DC, for plaintiffs.
Paul Crotty, Corporation Counsel for City of New York by Albert Fredericks, Gabriel Taussig, Mordecai Newman, Assistant Corporation Counsels, New York City, for defendants.
Curtis, Mallet-Prevost, Colt & Mosle, New York City by Benard V. Preziosi, Jr., for amici curiae U.S. Representatives.
Fried, Frank, Harris, Shriver & Jacobson by Ira S. Sacks, Teresa A. Pesce, Lisa E. Brody, Jocelyn L. Jacobson, Gregory J. Ikonen, New York City, Dennis A. Henigan, Washington, DC, for amici curiae Center to Prevent Handgun Violence Legal Action Project, et al.
Jerold E. Levine, Valley Stream, NY, for amici curiae Federation of New York State Rifle and Pistol Clubs, Inc.

MEMORANDUM and ORDER
RAGGI, District Judge:
Plaintiffs, Richmond Boro Gun Club, Inc., the National Rifle Association of America ("NRA"), the New York State Rifle and Pistol Association, Inc., and six New York City residents identified simply as "John Does I through VI," bring this action for declaratory judgment and injunctive relief against the City of New York and its Police Commissioner. At issue is New York City Local Law 78 of 1991, which amends the city's Administrative Code to criminalize the possession or transfer of certain "assault weapons" and "ammunition feeding devices" within the five boroughs. N.Y.C. Administrative Code, Ch. 1 § 10-131, and Ch. 3 § 10-301 et seq. (Supp. 1992).
Plaintiffs raise the following federal and state law challenges to the local law: (1) it is preempted by those federal laws and regulations establishing the Civilian Marksmanship Program, (2) it deprives them of rights to liberty and property without due process, (3) it is preempted by New York State law, (4) it is unconstitutionally vague, (5) it serves no rational purpose and thus violates the Constitution's Due Process and Equal Protection Clauses, and (6) it grants excessive rule-making authority to New York City's Police Commissioner in further violation of the Due Process Clause. They further complain (7) that the Commissioner has exercised his authority in an arbitrary and capricious manner.
Plaintiffs initially sought a preliminary injunction barring enforcement of Local Law 78. This application was referred to Chief Magistrate Judge A. Simon Chrein who, on April 16, 1992, recommended that no injunction be entered. The court adopted this recommendation on May 29, 1992. In the interim, defendants moved for summary judgment. This motion was also referred to Chief Magistrate Judge Chrein. On February 23, 1994, he filed his report recommending that the court grant defendants' motion. Plaintiffs have filed objections to this report and defendants have responded.
This court has carefully reviewed all papers filed since the inception of this case.[1] It *280 holds that summary judgment is appropriately entered in favor of defendants on all federal claims. Plaintiffs' state claim is dismissed for lack of independent federal jurisdiction.

Factual Background
On July 30, 1991, at the request of then-Mayor David W. Dinkins and with the support of then-Police Commissioner Lee P. Brown as well as various other city officials, the New York City Council enacted Local Law 78 prohibiting the possession or transfer within New York City of "assault weapons" and certain ammunition feeding devices. Administrative Code §§ 10-303.1(a), 10-306, 10-131(i)(6).
The rationale for the legislation, which went into effect January 11, 1992, is stated in its preamble:
Legislative intent. It is hereby declared and found by the council that certain guns, commonly referred to as semiautomatic "assault weapons," are generally recognized as particularly suitable for military and not sporting purposes. The council further finds and declares that ammunition feeding devices which are capable of holding more than five rounds of ammunition and which are capable of being used in assault weapons are particularly suitable for military and not sporting purposes. The council further finds and declares that because assault weapons and such ammunition feeding devices pose a grave threat to law enforcement officers and to the public, it is necessary to impose restrictions on the possession, sale and use of such weapons and ammunition feeding devices. It is not, however, the council's intent to place additional restrictions on the possession, sale or use of rifles and shotguns which are primarily designed and intended for hunting, target practice or other legitimate sports or recreational activities.
The ordinance defines "assault weapons" to include these items:
(a) Any semiautomatic centerfire or rimfire rifle or semiautomatic shotgun which has one or more of the following features:
1. folding or telescoping stock or no stock;
2. pistol grip that protrudes conspicuously beneath the action of the weapon;
3. bayonet mount;
4. flash suppressor or threaded barrel designed to accommodate a flash suppressor;
5. barrel shroud;
6. grenade launcher; or
7. modifications of such features, or other features, determined by rule of the commissioner to be particularly suitable for military and not sporting purposes. In addition, the commissioner shall, by rule, designate specific semiautomatic centerfire or rimfire rifles or semiautomatic shotguns, identified by make, model and/or manufacturer's name, as within the definition of assault weapon, if the commissioner determines that such weapons are particularly suitable for military and not sporting purposes.
(b) Any shotgun with a revolving-cylinder magazine.
(c) Any part, or combination of parts, designed or redesigned or intended to readily convert a rifle or shotgun into an assault weapon.
(d) "Assault weapon" shall not include any rifle or shotgun modified to render it permanently inoperative.
§ 10-301(16).
The law provides for New York City's Police Commissioner to promulgate a list of specific firearms that fall within the assault weapon ban. § 10-301(16)(a)(7). Pursuant to this authority, the Commissioner established a Firearms Review Committee comprised of individuals within the Police Department with expertise in firearms. Based on the recommendations of this Committee, the Commissioner issued a list of firearm makes and models to be treated as assault weapons.
Local Law 78 defines "ammunition feeding devices" as "[m]agazines, belts, feedstrips, drums or clips capable of being attached to or utilized with firearms, rifles, shotguns or *281 assault weapons." § 10-301(17). The law bans possession or disposition of any such feeding devices capable of holding more than five rounds of ammunition if designed for use with a rifle or shotgun, § 10-306, or capable of holding more than seventeen rounds of ammunition if designed for use with a handgun, § 10-131(i)(6).
The law makes any illegal possession or transfer of an assault weapon or any of the proscribed ammunition feeding devices a criminal misdemeanor punishable as a first unaggravated offense by imprisonment of not more than fifteen days and/or a fine of up to $300. Subsequent offenses are also deemed misdemeanors, but expose a defendant to imprisonment of up to one year and/or a fine of up to $5,000. §§ 10-303.1(b), 10-310. Possession or transfer of ammunition feeding devices not designed for use with a handgun and holding more than seventeen rounds of ammunition is punishable by a fine of not more than $1000 and/or by imprisonment of not more than one year. § 10-131(i)(14). The same conduct carries a possible civil penalty of up to $1,000 for an unaggravated first violation and up to $10,000 for each violation thereafter. §§ 10-303.1(c), 10-131(i)(15).
Certain exceptions apply to the local law's prohibitions against assault weapons and specified ammunition feeding devices. § 10-305. Most notably, the prohibitions do not apply to state and city police or peace officers carrying such items in the lawful performance of their duties. § 10-305(c). Neither do they apply to members of the federal or state armed forces who are authorized by law to carry these weapons. § 10-305(c) and (d). The law does not, however, exempt persons participating in the federal government's Civilian Marksmanship Program. § 10-305(1).
Local Law 78 provides no "grandfather clause" protection for those already in possession of the proscribed assault weapons or ammunition feeding devices. It did, however, grant those persons holding permits for such devices a grace period of ninety days from the effective date of the law either to surrender them to the appropriate authorities or lawfully to remove them from New York City. In January of 1992, the Police Commissioner notified all permit holders that the deadline for compliance was April 18, 1992.
Persons holding assault weapons or proscribed ammunition feeding devices without permit were expected to surrender these immediately to authorities, but the law immunized those who complied with this provision from prosecution for unlawful possession. §§ 10-305(f), 10-131(16). Indeed, the option for such voluntary surrender without prosecution remains available under the law. Id.

Discussion

I. Summary Judgment

Summary judgment is appropriate only when there are no genuine issues of material fact requiring resolution at trial and when it can be said that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309 (2d Cir.1994). The movant bears the initial burden of demonstrating the absence of any genuine issue of fact. Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d at 309. A party opposing summary judgment must then come forward with specific evidence that, if credited, would support a verdict in its favor. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). In this case, the court finds that the evidence proffered by plaintiffs in opposition to defendants' motion for summary judgment, even if credited, is not sufficient to support the federal challenges they raise to the enforcement of Local Law 78.

II. Rationality of the Ordinance

Plaintiffs contend that Local Law 78 is irrational and arbitrary and, therefore, violative of due process and equal protection in that (1) it defines semiautomatic rifles and shotguns as assault weapons when, in fact, only automatic weapons are accurately categorized as such; (2) it finds that semiautomatic weapons are suited for military purposes when all armed services rely only on *282 automatic weapons; and (3) it serves no legitimate governmental purpose. The challenge is patently without merit and can be rejected as a matter of law.
Plaintiff's first two arguments are disposed of easily. As the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") noted when it banned the importation of certain semiautomatic rifles in 1989, although "[t]rue assault rifles are selective fire weapons that will fire in a fully automatic mode," certain semiautomatic rifles are nevertheless also "often referred to as `assault rifles,' `assault-type rifles,' `military style rifles,' or `paramilitary rifles.'" Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles 6 (1989) ("ATF Report") (Exh. F to Defendants' Notice of Motion). This is because certain semiautomatic rifles are "versions of true selective fire military assault rifles." Id. Modern military rifles contain "a variety of physical features and characteristics designed for military applications which distinguish[] [them] from traditional sporting rifles. These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle." Id. In light of these common features, it cannot be said that the City Council acted irrationally in concluding that certain semiautomatic rifles and shotguns were more suited to military rather than sporting purposes. Neither can it be said that its decision to label such arms as assault weapons was arbitrary.
Defendants also easily explain the legitimate governmental purpose behind Local Law 78: the promotion of public safety. They note the high density of New York City's population and the disturbingly large number of homicides annually caused by gunfire within its borders. They submit that the risk to public safety increases when persons are armed with weapons such as semiautomatic rifles or shotguns capable of firing large amounts of ammunition at close range in a short period of time. Under such circumstances, they contend that it was a rational exercise of the city's police power to enact legislation restricting the possession of such weapons within the city. The court agrees.
The promotion of public safety is "unquestionably at the core" of a municipality's police power. See, e.g., Kelley v. Johnson, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445-46, 47 L.Ed.2d 708 (1976). Legislation enacted pursuant to this power is entitled to a strong presumption of validity. Id. So long as a law does not infringe on fundamental rights or discriminate against suspect classes, a court must accord "wide latitude" to a legislature's judgment as to the circumstances warranting exercise of a city's police power. See, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations...."). Thus, the question for this court is not whether New York City can "`establish' a `genuine public need'" for the challenged ordinance. Kelley v. Johnson, 425 U.S. at 247, 96 S.Ct. at 1445-46. Rather it is whether plaintiffs can demonstrate that there is "no rational connection between the regulation ... and the promotion of safety of persons and property." Id. Indeed, to succeed on their constitutional claims, plaintiffs must demonstrate that the ordinance is "so irrational that it may be branded `arbitrary.'" Id. at 248, 96 S.Ct. at 1446.
Plaintiffs cannot meet this heavy burden. The rational link between public safety and a law proscribing possession of semiautomatic rifles and shotguns is so obvious that it would seem to merit little serious discussion. But the court does note that the record of proceedings before the City Council prior to its enactment of Local Law 78 provides strong support for its action. For example, Manhattan District Attorney Robert M. Morgenthau reminded the Council that, in 1991, the city had its highest number of homicides  2,250  of which 69% involved the use of a gun. While most of these homicides were committed with handguns, Mr. Morgenthau nevertheless sounded this caution:
The use of high-powered assault weapons is growing at an alarming rate. Drug dealers, organized crime and other gang members covet them because they are *283 powerful, have a rapid firing mechanism, are quick to reload and can be equipped with detachable magazines that carry 30 or more rounds.
Hearings before the Comm. on Public Safety of the New York City Council, June 26, 1991 (Exh. E to Defendants' Notice of Motion).
The point was echoed by Brooklyn District Attorney Charles J. Hynes:
Assault weapons may not have outpaced handguns as the weapons of choice on Brooklyn streets, but they are of great concern to my office because of the danger that they pose to innocent bystanders. Assault weapons can spray a crowd with up to 100 rounds of ammunition. Their bullets can penetrate steel doors, as well as several walls and ceilings....
Id.
Joining his colleagues in urging the Council to take action was Bronx District Attorney Robert T. Johnson:
These military-style weapons, designed for no other purpose than to take human life as efficiently as possible, are becoming common on our streets. They are particularly attractive to drug dealers, who used them to increase their firepower as well as ... to intimidate each other and the community at large. Last month, my Office executed a series of search warrants ... into the operation of a major Bronx narcotics ring. The raids netted some 23 assorted firearms, including seven assault weapons of various types. The presence of such lethal hardware in the hands of narcotics dealers and other criminals poses a significant threat to the public safety. It is also of grave concern to law enforcement personnel, who more and more often are finding themselves outgunned as well as overburdened.
Id.
Not insignificantly, the Council was aware of the 1989 ATF ban on the importation of 43 specific models of semiautomatic assault rifles into the United States. This step was taken, at least in part, because of "the growing problem presented by semiautomatic assault-type rifles and their use in crime in the United States," particularly "the illicit drug trade." See Affidavit of then-ATF Director Stephen E. Higgins ¶¶ 6, 12 (Exh. D to Defendants' Notice of Motion). The proliferation of such weapons was evidenced by agency importation statistics, which indicated that in 1985 and 1986 approximately 4,000 semiautomatic assault-type rifles were approved for importation into the United States. By 1987, that figure had jumped to approximately 39,000. By the third month of 1989, when ATF suspended importations, the agency had applications pending to import over 111,000 assault-type rifles and outstanding permits to import over 420,000 more. Id. at ¶ 11. Of course, as Mayor Dinkins pointed out to the City Council, the federal prohibition against the importation of semiautomatic assault rifles did not affect domestic production of such weapons, which were readily available to the public. See Hearings before Comm. for Public Safety of the New York City Council, June 26, 1991.
Plaintiffs nevertheless insist that the statistical and anecdotal evidence presented to the City Council in support of the local law was flawed and overstated the risk to public safety from the semiautomatic rifles and shotguns proscribed by Local Law 78. For example, plaintiffs note that certain studies cited to the Council did not distinguish between fully automatic and semiautomatic weapons or between semiautomatic handguns and rifles. Plaintiffs consider the latter omission particularly troublesome because most homicides are still committed with handguns, possession of which is not prohibited by the local law. They further submit that certain of the shooting incidents involving semiautomatic rifles that were cited to the Council would have been just as tragic in result if the perpetrator had been armed with a different weapon.
Even assuming the correctness of plaintiffs' statistical analysis,[2] they have not *284 demonstrated that Local Law 78 is irrational. See generally Gun South, Inc. v. Brady, 877 F.2d 858, 866 (11th Cir.1989) (rejecting rationality challenge to federal ban on importation of semiautomatic rifles). Legislation need not be supported by precise empirical evidence to survive rational scrutiny. See Vance v. Bradley, 440 U.S. 93, 110-111, 99 S.Ct. 939, 949-50, 59 L.Ed.2d 171 (1979); Disabled American Veterans v. United States Dep't of Veterans Affairs, 962 F.2d 136, 143 (2d Cir.1992). Indeed, the fact that weapons other than those proscribed by Local Law 78 also pose risks to public safety is of no constitutional import. A "`statute is not invalid under the Constitution because it might have gone farther than it did.'" City of New Orleans v. Dukes, 427 U.S. at 305, 96 S.Ct. at 2517-18 (quoting Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966)). Legislatures are free to attack problems of public safety one step at a time and in such order as they deem appropriate. Id. at 303, 96 S.Ct. at 2516-17. At the time Local Law 78 was enacted, various federal and New York State statutes addressed automatic weapons and handguns. While some city officials were of the view that this legislation was not strong enough, it was certainly reasonable for the Council to focus its attention on what it perceived to be an otherwise unaddressed problem. Plaintiffs have simply failed to demonstrate that, on the evidence before it, the Council could not reasonably have believed that the weapons proscribed in Local Law 78 presented a real and growing risk to public safety. See Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 463, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399 (1988).
Indeed, a number of other cities and states have enacted legislation prohibiting the possession of semiautomatic assault-type rifles. See Robertson v. Denver, 874 P.2d 325, 335 (Colo.1994) (upholding Denver ordinance banning possession and disposition of semiautomatic rifles and shotguns, but severing provision pertaining to semiautomatic pistols); Citizens for a Safer Community v. Rochester, 164 Misc.2d 822, 826, 627 N.Y.S.2d 193, 197 (Sup.Ct. Monroe Co. 1994) (finding portion of Rochester ordinance criminalizing sale and possession of semiautomatic rifles or shotguns capable of using ammunition feeding devices holding more than six rounds to be constitutional); Arnold v. Cleveland, 67 Ohio St.3d 35, 49, 616 N.E.2d 163, 173 (1993) (holding Cleveland ordinance prohibiting possession and sale of "assault weapons," including semiautomatic rifles and hotguns, to be reasonable exercise of city's police power). Moreover, in 1994, Congress decided that semiautomatic rifles and shotguns akin to those proscribed by Local Law 78 presented a sufficient risk to national public safety that it enacted legislation limiting their possession and transfer. 18 U.S.C. § 921(a)(30)(B) (1988 & Supp.1995). The fact that New York City is not alone in limiting the possession of these weapons further undermines plaintiffs' rationality challenge.
The court recognizes that there is room for responsible public debate on the subject of gun control. Certainly, persons with strong views both for and against such legislation have actively lobbied national and local law-makers for over twenty years. But the mere fact that persons may hold different opinions on a subject or that evidence can be marshalled in support of different views does not make an ultimate legislative choice between the two positions "irrational" or "arbitrary." To the contrary: it is precisely when facts and policies are arguable that courts must defer to legislative judgment. Vance v. Bradley, 440 U.S. at 112, 99 S.Ct. at 950. *285 Summary judgment is entered in favor of defendants on this claim.

III. Federal Preemption

Plaintiffs ask this court to find Local Law 78 preempted by those federal laws and regulations establishing the Civilian Marksmanship Program ("CMP").
The concept of federal preemption derives, of course, from the Constitution's Supremacy Clause. U.S. Const. art. VI, cl. 2. The significance of the Clause was made plain by Chief Justice Marshall in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824): state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution" will not stand. Id. at 211.
Precisely because the Supremacy Clause does afford Congress "extraordinary power in a federalist system," courts do not readily assume its exercise. See Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400-01, 115 L.Ed.2d 410 (1991). To the contrary, the well-established presumption is against federal preemption of local law unless a court is "absolutely certain" that such was Congress's intent. Id. at 464, 111 S.Ct. at 2402-03; Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128-29, 68 L.Ed.2d 576 (1981). Such certainty is particularly warranted when a challenged local law concerns public safety since the proper "assumption [is] that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); accord California v. ARC America Corp., 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989).
Congress's intent to preempt local law can be expressed in various ways. Most plainly, it can be stated explicitly in a federal statute. See, e.g., Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) (discussing explicit preemption provision of ERISA). It can also be evidenced by a pervasive scheme of federal regulation that leaves no room for any state or local role. See, e.g., City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (finding F.A.A. and E.P.A. regulation of aircraft noise so pervasive as to exclude state and local regulation).
Plaintiffs concede that, in providing for the CMP, Congress has nowhere used express language to preempt state and local gun control laws. Neither has it established a scheme of regulation so comprehensive as to displace state and local law. To the contrary, compliance with certain local safety law is expressly required under the CMP. See, e.g., 32 C.F.R. §§ 543.9(1)(d)(iii)(D); 543.17(g)(5)(ii); 543.17(g)(5)(v); 543.21(a)(2); 543.22(a)(i), (ii) (1994). Instead, plaintiffs urge preemption on the ground that Local Law 78 conflicts with the federal laws and regulations pertaining to the CMP.
Courts have recognized that local law is appropriately preempted "to the extent that it actually conflicts with federal law." Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Such a conflict, however, must be real; it will not be "implied." Penn Dairies, Inc. v. Milk Control Comm'n, 318 U.S. 261, 275, 63 S.Ct. 617, 623-24, 87 L.Ed. 748 (1943). Thus, for a conflict between federal and local laws to warrant preemption, "`compliance with both federal and state regulations'" must be "`a physical impossibility,'" Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, supra (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963)), or compliance with the local law must stand "`as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). The key question is whether the consequences of complying with the local law "sufficiently injure the objectives of the federal program to require nonrecognition." McCarty v. McCarty, 453 U.S. 210, 232, 101 S.Ct. 2728, 2741, 69 L.Ed.2d 589 (1981) (quoting Hisquierdo v. *286 Hisquierdo, 439 U.S. 572, 583, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979)).
In order to determine whether there is such a conflict between the CMP and Local Law 78, this court must examine both the objectives of this federal program and the statutes and regulations pertaining to it.
The CMP was established by Congress in 1904 to familiarize young men with the use of firearms and to develop their marksmanship proficiency should they ever be called to duty in the armed forces. See Senate Report No. 1852, 58th Cong.2d Session (1904) (endorsing recommendation of the National Board for the Promotion of Rifle Practice that it "qualify[] as finished marksmen those individuals who may be called upon to serve in time of war ..."). From time to time, critics have questioned the continuing need for the program, particularly as military technology grows more sophisticated. Nevertheless, Congress has continued to support the CMP. This court must respect its judgment that the program has a place in the country's larger defense plan.[3]
To promote civilian marksmanship proficiency, Congress has authorized the President to "detail a commissioned officer of the Army or of the Marine Corps as director of civilian marksmanship, to serve under the direction of the Secretary of the Army." 10 U.S.C. § 4307 (1988). The Secretary of the Army is in turn directed to provide, among other things, for (1) the operation and maintenance of rifle ranges; (2) the instruction of citizens in marksmanship; (3) the promotion of practice in the use of rifled arms, as well as "the maintenance and management of matches or competition in the use of those arms, and the issue without cost, of the arms, ammunition, targets and other supplies and appliances necessary for those purposes"; (4) the award of prizes to competitors; (5) the loan or sale of various weapons, including "caliber .30 rifles" to approved gun clubs; and (6) the sale of surplus M-1 Garand rifles to citizens over 18 who are members of approved gun clubs. 10 U.S.C. § 4308(1)-(6) (1988 & Supp.1995).
32 C.F.R. § 621.2 (1994) establishes the requirements for the sale of surplus weapons to civilians, presumably including the sale of the M-1 Garand rifles referred to in § 4308(6). It states that such sales "will be limited to quantities ... which authorized purchasers can put to their own use. It is not intended that property be sold under the provisions of this section for the purpose or [sic] resale or other disposition." § 621.2(a)(3).
Other regulations implementing the CMP are found at 32 C.F.R. § 543.1 et seq. (1994). Pursuant thereto, local shooting clubs, such as plaintiff Richmond Boro Gun Club, are approved for participation in the program by the Director of Civilian Marksmanship. 32 C.F.R. § 543.9. Approval will not be granted if any adult club member has been convicted of or has charges pending against him for any "violation of Federal, State, or local firearms regulations." 32 C.F.R. § 543.9(1)(d)(iii)(D). Approved clubs may receive marksmanship training materials subject to availability. 32 C.F.R. § 543.10(a). Based on the number of members, clubs can also be loaned certain caliber .22 and caliber .30 rifles. 32 C.F.R. § 543.10(b) and (d). Richmond Boro Gun Club has received a number of weapons from the federal government pursuant to these regulations.
Responsibility for any government-issued property rests with club officers. 32 C.F.R. § 543.17(a). Weapons supplied by the government may, however, be issued to the custody of individual adult members who can provide the security required by regulation. 32 C.F.R. § 543.17(g)(3). The pertinent security regulation states that "[a]rms may be stored in the homes of the club custodian and of individual members" so long as they are not in view and are kept in a locked container as specified. 32 C.F.R. § 543.17(g)(5)(ii) (emphasis added). There is, however, a further mandate that "[s]torag[e] will, in addition, conform to local ordinances and regulations, if any." 32 C.F.R. § 543.17(g)(5)(v). As is apparent, the regulation only permits and does not require that government-issued *287 firearms be stored in private homes. Indeed, the regulation states that "[s]torage at a military or law enforcement facility is encouraged when deemed feasible by the club." 32 C.F.R. § 543.17(g)(5)(vi).
Participating clubs "must conduct an active rifle marksmanship training program (firing and nonfiring) for a reasonably permanent membership for at least nine months each year." 32 C.F.R. § 543.13. At least once a year, each club member must fire a rifle course prescribed by the Director of Civilian Marksmanship. 32 C.F.R. § 543.14(a). The regulations do not require this course to be completed at any particular site. Although private ranges can be used, the regulations also contemplate that approved club members will be permitted to practice marksmanship on military bases "subject to local range regulations," 32 C.F.R. §§ 543.21(a)(2), and in "compliance with local safety and other regulations." 32 C.F.R. § 543.22(a)(1)(ii).[4]
By statute, the Secretary of the Army is required to conduct annual marksmanship competitions called the National Matches. 10 U.S.C. § 4312. These are generally held at Camp Perry, Ohio. 32 C.F.R. § 544.9. A host of regulations prescribe the policies and procedures for the National Matches. These same policies and procedures apply to other competitive matches, which are permissive rather than mandated. For example, they apply to any matches "established" by the armed services "in which civilians may participate." 32 C.F.R. § 544.4(c). Similarly, civilian clubs "may conduct similar matches in conjunction with NRA Regional and State Championships" with the approval of the Director of Civilian Marksmanship. 32 C.F.R. § 544.4(d) (emphasis added). Both the mandated National Matches and any discretionary local matches are recognized as "part of the CMP" and "are intended to promote the national defense." 32 C.F.R. § 544.4(b).
The regulations applicable to the National Matches (and any others conducted pursuant to the CMP) provide for various competitive categories, some of which plainly pertain only to individuals directly associated with the military, such as (1) regular service members, (2) members of the reserve branches, (3) members of the National Guard, and (4) individuals enrolled in the service academies or an ROTC unit. 32 C.F.R. § 544.34(a)-(d). Another competitive category applies to police officers. 32 C.F.R. § 544.34(e). There are two competitive categories for civilians, one for persons under 20 years of age, the other for persons 20 or older. 32 C.F.R. § 544.34(f)-(g). It is presumably in these that CMP members would most often participate.
The arms to be used in the National Matches and any other competitions governed by the applicable regulations are specifically set forth: (1) a US rifle, caliber .30 M1 as issued by the Army or a commercial rifle of the same type and caliber; (2) a US rifle, caliber 7.62mm M14 series or a commercial rifle of the same type and caliber; (3) a US rifle, caliber 5.56mm M16 series or a commercial equivalent; and (4) a US pistol, caliber .45M1911 or M1911A1 or a commercial equivalent. 32 C.F.R. § 544.52(a)-(d).
In urging this court to find Local Law 78 preempted by the federal laws and regulations just outlined, plaintiffs emphasize that decisions pertaining to the proper defense of this country rest exclusively with the national government and cannot be impeded by the states. This is obvious. What is not so plain, however, is plaintiffs' contention that the enforcement of Local Law 78 will in any way hinder that part of the national defense strategy represented by the CMP.
Plaintiffs attempt to identify a conflict in the fact that Richmond Boro Gun Club has already been issued various rifles pursuant to the above-referenced CMP regulations while Local Law 78 prohibits the continued possession of these weapons. Similarly, they complain that club members either have bought or wish to buy M-1 Garand rifles from the government, which conduct is also violative of the local law. Plaintiffs are mistaken in their analysis.
*288 Local Law 78 does not prohibit city residents from receiving CMP-issued rifles nor from purchasing M-1 Garand rifles. It requires only that they store and use these weapons outside city limits. Nothing in the applicable federal laws or regulations requires a CMP club or its members to store or practice with these rifles in New York City or at any particular site. Plaintiffs' real complaint then is not conflict between federal and local law but personal inconvenience, since they are barred from keeping assault weapons in their homes and from practicing with them at their club's Staten Island rifle range. But such inconvenience is of no legal import. Home storage of government-issued weapons is only permitted under federal regulation; it is not mandated. 32 C.F.R. § 543.17(g)(5)(ii). The only storage site actively "encouraged" by federal regulation is storage at military or police facilities. 32 C.F.R. § 543.17(g)(5)(vi). Since such storage would necessarily require civilians to travel at least some distance from their homes to gain access to their rifles, and since such access might further be limited by the hours when such facilities are open to the public, it necessarily follows that no link exists between the federal interest in promoting civilian marksmanship and the site where persons store their weapons. Similarly, since federal law does not require CMP clubs to maintain their own ranges, the fact that plaintiffs will not be able to use assault rifles on their Staten Island range but will have to use some other facility does not evidence a conflict requiring preemption.
Plaintiffs cite as a further conflict New York City's ban on three rifles  the M1, M14, and M16  specifically prescribed by federal regulation for use in CMP matches. 32 C.F.R. § 544.52(a)-(c). Here again, there is no real conflict. Local Law 78 does not prohibit city residents from using such weapons in CMP matches. It simply stands as a practical bar to any such matches being held in New York City and to city residents practicing with M1, M14, or M16 rifles within the five boroughs. The applicable federal laws and regulations nowhere require that any CMP matches be held in New York City. Indeed, they do not specifically require that any CMP matches be held other than the National Matches at Camp Perry, Ohio. The regulations merely provide that regional and state CMP matches may be held in conjunction with NRA championships. 31 C.F.R. § 544.4(d). The court is convinced that the federal interest in promoting civilian marksmanship does not depend on competitive matches being held in New York City. Thus Local Law 78's prohibition against possession of M1, M14, and M16 rifles within the city is not in conflict with the CMP.
Those plaintiffs who have purchased M-1 Garand rifles from the federal government claim that they cannot possibly comply with both federal and local law since, at the time of acquisition, they signed a sworn statement that they were acquiring the weapon for personal use and not for resale or disposition. 32 C.F.R. § 621.2(a)(3). They submit that it is impossible for them to dispose of these guns and bring themselves into compliance with Local Law 78 without thereby violating federal regulations. In fact, plaintiffs could comply with both federal and local law by either returning their Garand rifles to the federal government or by storing them out of New York City. The federal government's obvious concern that Garand rifles not be acquired for resale or transfer to unauthorized persons is in no way undermined by Local Law 78.
As noted at the outset, the primary objective of the CMP is the promotion of marksmanship skills among civilians who may be called upon to serve in the armed forces in time of war. Nothing in the record indicates that the development of accurate marksmanship is dependent upon the exclusive use of semiautomatic weapons or ammunition firing devices that store large numbers of rounds. Civilian marksmanship can thus still be practiced by plaintiffs within New York City in a real and meaningful way so long as they do not use proscribed weapons. To the extent plaintiffs do wish to use assault weapons, whether to complete their annual CMP certification or to prepare for or participate in certain competitive matches, their continued ability to do so outside New York City suffices to ensure that the federal goals of the CMP and the public safety concerns of Local Law 78 can both be realized without conflict. *289 Summary judgment is entered in favor of defendants on plaintiffs' claim of federal preemption.

IV. Vagueness

Plaintiffs contend that the definition of "assault weapon" in Local Law 78 is so vague on its face as to deny due process.
"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The concern animating the vagueness doctrine is two-fold: (1) does the law give "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; and (2) does the law provide reasonable standards to law enforcement authorities to ensure against arbitrary and discriminatory application. Id. at 108-09, 92 S.Ct. at 2298-99. A law is not impermissibly vague simply because it "`requires a person to conform his conduct to an imprecise but comprehensible normative standard.'" Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971)). What due process will not tolerate is a law that specifies "`no standard of conduct ... at all.'" Id.
As plaintiffs concede, Local Law 78 implicates no constitutionally protected conduct. As a result, their facial vagueness challenge can succeed "only if they demonstrate that the law is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 495, 497, 102 S.Ct. at 1191-92, 1193 (emphasis added); United States v. Schneiderman, 968 F.2d 1564, 1568 (2d Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993); Brache v. County of Westchester, 658 F.2d 47, 50 (2d Cir.1981). As long as the law clearly encompasses at least some core of conduct in which plaintiffs engage, a court will not entertain a facial vagueness challenge to other conduct, whether real or hypothetical, by plaintiffs or others. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 495, 501-02, 102 S.Ct. at 1191-92, 1194-95; Brache v. County of Westchester, 658 F.2d at 51-54.
Plaintiffs have failed to frame their attack in light of this standard. Instead, they hypothesize some ambiguous application for each factor used by New York City to identify the semiautomatic rifles and shotguns that will be deemed assault weapons under Local Law 78. But such conjectures hardly suffice to establish vagueness in all applications of the law.
For example, plaintiffs complain that defining assault weapons to include rifles or shotguns with a "folding or telescoping stock or no stock" is vague because some person might unwittingly violate the law by removing a stock for a brief period to clean or transport a weapon. This possibility ignores the "core" category of weapons within this factor that are clearly intended to be the focus of the legislation: those either equipped with folding stocks or with permanently-removed stocks. The governmental concern is that such weapons can be discharged in a way that is characteristic of military and not sporting weapons. Since persons have plain notice of the applicability of the law to this core group of weapons, there is no facial vagueness in this factor.
Plaintiffs further complain that defining an assault weapon by reference to "a pistol grip that protrudes conspicuously beneath the action of the weapon" is impermissibly vague because it is unclear what is meant by "conspicuously." The argument is disingenuous. As is made plain in the earlier-cited ATF Report prepared in connection with that agency's ban on the importation of assault weapons, most sporting firearms "employ a more traditional pistol grip built into the wrist of the stock of the firearm." ATF Report at 7 (emphasis added). By contrast, "[t]he vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon." Id. (emphasis added). The latter design is favored in military weapons because it aids in "one-handed firing" at hip *290 level, a technique sometimes required in combat, but "not usually employed in hunting or competitive target competitions" where a firearm is held with two hands and fired at shoulder level. Id. Although plaintiffs argue that any rifle can be shot with one hand and at hip level, that is hardly the point. This factor aims to identify those rifles whose pistol grips are designed to make such spray firing from the hip particularly easy. Even a cursory review of the photographs submitted by the parties demonstrates that a sufficient number of assault rifles are so plainly equipped with grips that protrude conspicuously that it cannot be said that the factor is vague in all applications. Indeed, the court notes that Congress itself chose the very same formulation as a defining term for assault weapons in federal legislation. 18 U.S.C. § 921(a)(30)(B)(ii).
Plaintiffs submit that defining assault weapons with reference to features such as a "bayonet mount," "a flash suppressor or threaded barrel designed to accommodate a flash suppressor," a "barrel shroud," or a "grenade launcher," violates due process because a host of items exist that, although not specifically intended to serve these purposes, could arguably do so, thereby subjecting an unsuspecting gun owner to criminal liability. This argument, however, defeats itself. As already noted, when a statute is challenged for facial vagueness, the issue is not whether plaintiffs can posit some application not clearly defined by the legislation. The issue is whether all applications are impermissibly vague. Certainly, there is no vagueness when the statute is applied to firearms advertised to include parts identified as bayonet mounts, flash suppressors, barrel shrouds, or grenade launchers.
Finally, plaintiffs complain that Local Law 78 is impermissibly vague in defining as an assault weapon "[a]ny part, or combination of parts, designed or redesigned or intended to readily convert a rifle or shotgun into an assault weapon." They submit that a rifle manufacturer's intent in designing a gun may not easily be discernable from the mere appearance of a weapon.
The Supreme Court has, however, already rejected vagueness challenges to similar language in other statutes. In Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra, the Court upheld a local ordinance requiring businesses to obtain licenses if they sold items "designed or marketed for use with illegal cannabis or drugs." The "designed" standard was held to encompass "at least an item that is principally used with illegal drugs by virtue of its objective features." 455 U.S. at 501, 102 S.Ct. at 1195. Although application of this standard might, in some cases, be ambiguous, it was sufficient to cover "at least some of the items" sold by Flipside and, thus, to preclude a facial vagueness challenge. Similarly, the vagueness challenge to the "marketed" standard was rejected in light of the implicit scienter element, "since a retailer could scarcely `market' items `for' a particular use without intending that use." Id. at 502, 102 S.Ct. at 1195. See also Posters `N' Things, Ltd. v. United States, ___ U.S. ___, ___, 114 S.Ct. 1747, 1750, 128 L.Ed.2d 539 (1994) (upholding federal statute that defined drug paraphernalia as items "primarily intended ... for use" or "designed for use" with controlled substances, although holding that neither standard required proof of scienter).
Applying the same analysis to this case, this court is persuaded from many of the submitted advertisements for semiautomatic rifles that the objective features of at least some of these firearms clearly bring them within the "designed" standard of Local Law 78. Whether the "intended to convert" standard does or does not require proof of scienter is a question that can be left for the New York courts. The fact remains that plaintiffs have failed to show that all applications of Local Law 78 are unconstitutionally vague.

V. Due Process

Plaintiffs claim that New York State law creates a liberty and property interest in the people to bear arms. See N.Y.Civ.Rights Law, art. 2, § 4 (McKinney 1992); N.Y.Gen. Mun.Law, art. 6, § 139-d (McKinney 1989); N.Y.Penal Law, arts. 265, 400 (McKinney 1987). Insofar as Local Law 78 deprives them of this interest, they assert it violates the due process guaranteed by the Fourteenth Amendment. The court assumes that *291 plaintiffs invoke procedural due process since violations of state law generally do not give rise to substantive due process claims. See Weimer v. Amen, 870 F.2d 1400, 1405-06 (8th Cir.1989).
In fact, it is far from clear that the state laws cited by plaintiffs do create a liberty or property interest in possessing semiautomatic weapons. Plaintiffs' argument in this respect depends largely on their pendent claim of state law preemption. For the reasons stated by Chief Magistrate Judge Chrein in his report, the merits of this claim are dubious at best. If they were presented to New York's highest court and rejected, there would be no basis for a federal due process claim. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971) (existence of liberty or property right entitled to protection of procedural due process depends on right being recognized under state law); accord Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); West Farms Assocs. v. State Traffic Comm'n, 951 F.2d 469 (2d Cir.1991).
When a federal constitutional claim is so dependent upon the interpretation of an uncertain state statutory scheme, and when state law is susceptible to an interpretation that could avoid or modify the constitutional claim, a federal court will, in the interests of comity and federalism, abstain from exercising its jurisdiction to afford the parties an opportunity to seek resolution of the state law question in the local forum. Railroad Comm'n v. Pullman Co., 312 U.S. 496, 501, 61 S.Ct. 643, 645-46, 85 L.Ed. 971 (1941); see, e.g., Greater New York Metro. Food Council v. McGuire, 6 F.3d 75, 77 (2d Cir. 1993).
In this case, the court need not simply abstain from hearing plaintiffs' procedural due process claim. Assuming arguendo that some liberty or property right is here at stake, plaintiffs have totally failed to demonstrate that they have been denied appropriate procedural safeguards. When legislative as opposed to administrative action is at issue, the only procedure required by the Constitution is judicial review. See Bowles v. Willingham, 321 U.S. 503, 519-20, 64 S.Ct. 641, 649-50, 88 L.Ed. 892 (1944); accord Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir.1994). Since New York courts are available to hear declaratory judgment actions challenging the legality of municipal ordinances in light of the state constitution and laws, N.Y.Civ.P.Law § 3017 (1991); e.g., Jancyn Manuf. Corp. v. County of Suffolk, 71 N.Y.2d 91, 95, 524 N.Y.S.2d 8, 9, 518 N.E.2d 903, 903-04 (1987); Sonmax, Inc. v. City of New York, 43 N.Y.2d 253, 257-58, 401 N.Y.S.2d 173, 176, 372 N.E.2d 9, 11-12 (1977), plaintiffs' procedural due process challenge must be rejected as a matter of law and summary judgment entered in favor of defendants.

VI. Delegation of Rule-Making Powers to Police Commissioner

Plaintiffs claim that Local Law 78's delegation of rule-making authority to the Police Commissioner violates the Fourteenth Amendment's Due Process Clause. They further contend that the Commissioner has exercised this authority in an arbitrary and capricious manner in further violation of due process.
The latter claim is based on plaintiffs' argument that no one  whether the City Council or the Police Commissioner  could rationally categorize any semiautomatic rifle or shotgun as an assault weapon suitable for military purposes since no armed forces use such weapons. The court has already rejected this rationality challenge to Local Law 78 generally. For the same reasons, it rejects the argument as made more specifically against the Police Commissioner's exercise of rule-making authority under the law.
Plaintiffs' delegation challenge simply fails to state a cognizable federal claim. Article I, section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." Mindful of the Constitution's separation of powers among the branches of the federal government, the Supreme Court has derived from the quoted language a "non-delegation doctrine" prohibiting Congress from transferring its legislative powers to other governmental branches. See Mistretta v. United *292 States, 488 U.S. 361, 371, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989); United States v. Pitera, 795 F.Supp. 546, 560 (E.D.N.Y.1992). But nothing in the federal Constitution speaks to the delegation of legislative powers by state and local governments. Any such claim must be based on state law. See Friedman v. Beame, 558 F.2d 1107, 1111 (2d Cir.1977). Since plaintiffs invoke only the Fourteenth Amendment in support of this claim, judgment is entered in favor of defendants.

VII. State Law Preemption

Plaintiffs claim that Local Law 78 is preempted by New York State law, specifically N.Y.Civ.Rights Law, art. 2, § 4; N.Y.Gen.Mun.Law, art. 6, § B9-d; and N.Y.Penal Law, arts. 265, 400. This court, having granted judgment in favor of defendants on all federal claims, declines to exercise pendent jurisdiction over this state law question. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Gelles v. TDA Indus., Inc., 44 F.3d 102, 106 (2d Cir.1994).

Conclusion
The court rejects as a matter of law plaintiffs' challenge to the rationality of Local Law 78 and to the Police Commissioner's exercise of rule-making authority under that law. It further rejects as a matter of law plaintiffs' claim that the local law is facially vague in all its applications and their claim that the law is preempted by federal laws and regulations pertaining to the Civilian Marksmanship Program. It finds that plaintiffs have failed to state a federal claim for denial of procedural due process or for impermissible delegation of legislative powers. Accordingly, summary judgment is entered in favor of defendants on all federal claims. The sole remaining claim  alleging state law preemption of Local Law 78  is dismissed for lack of independent federal jurisdiction.
SO ORDERED.
NOTES
[1] In addition to the parties' submissions, three briefs were filed by amici: (1) the Federation of New York State Rifle and Pistol Clubs, Inc., supporting plaintiffs; (2) the Center to Prevent Handgun Violence, the Police Conference of New York Inc., the Metropolitan Police Conference of New York State, Inc., the New York State Association of Chiefs of Police, Inc., the Detectives' Endowment Association, the Captains Endowment Association, the Lieutenants Benevolent Association, the Sergeants Benevolent Association, and the New York City Transit PBA, supporting defendants; and (3) twelve individuals (Charles E. Schumer, Gary L. Ackerman, Eliot L. Engel, Floyd H. Flake, Thomas J. Manton, Major R. Owens, Charles B. Rangel, James H. Scheuer, Jose E. Serrano, Edolphus Towns, Stephen J. Solarz, and Ted Weiss) then serving as Representatives to the United States Congress for various districts in New York City, in further support of defendants.

The United States Attorney declined the court's invitation to file any papers on behalf of the United States government or any branch or agency thereof.
[2] Although plaintiffs submit that the link between semiautomatic assault rifles and crime is more speculative than real, the most cursory research calls this conclusion into question by confirming the frequency with which semiautomatic rifles figure in federal criminal cases. See, e.g., United States v. Webb, 49 F.3d 636, 637 (10th Cir.1995) (defendant convicted of possession of 142 cultivated marijuana plants and .22 caliber semiautomatic rifle with homemade silencer); United States v. Garrett, 45 F.3d 1135, 1136 (7th Cir.) (semiautomatic sawed-off assault rifle used to protect drug enterprise), cert. denied, ___ U.S. ___, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995); United States v. James, 40 F.3d 850, 857 (7th Cir.1994) (loaded Luger .44 caliber semiautomatic rifle found during raid on cocaine and heroin traffickers), cert. denied, ___ U.S. ___, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995), and cert. denied, ___ U.S. ___, 115 S.Ct. 1160, 130 L.Ed.2d 1116 (1995); United States v. Lopez, 37 F.3d 565, 567 (9th Cir.1994) (loaded AK-47 assault rifle discovered in trash can during arrest of heroin traffickers), cert. denied, ___ U.S. ___, 115 S.Ct. 2246, 132 L.Ed.2d 254 (1995); United States v. Arocena, 778 F.2d 943, 948 (2d Cir.1985) (terrorist convicted of first degree murder and two conspiracies to murder diplomats used two AR-15 rifles), cert. denied, 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986).
[3] In fiscal year 1994, the CMP was allocated $2.48 million. The total defense budget that year exceeded $250 billion. Budget of the United States Government, Fiscal Year 1996 (U.S. Government Printing Office) (reporting 1994 actual amount).
[4] Plaintiffs point out that such military facilities as exist within New York City, for example, Fort Hamilton, do not have firing ranges. That, however, may say more about the proper concern even the organized armed forces have for firing rifles in an urban area than it does about the propriety of preempting Local Law 78.